## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **PAUL RUSESABAGINA,** | § | |
| **TACIANA MUKANGAMIJE,** | § | |
| **ANAISE UMUBYEYI** | § | |
| **KANIMBA, AIMEE-LYS** | § | |
| **RUSESABAGINA, CARINE** | § | |
| **ISERE KANIMBA, AIME-** | § | Civil Action No. 5:20-1422 |
| **DIANE RUSESABAGINA,** | § | |
| **TRESOR RUSESABAGINA,** | § | |
| **AND ROGER RUSESABAGINA,** | § | |
| | § | |
| *Plaintiffs,* | § | **JURY TRIAL DEMANDED** |
| | § | |
| **v.** | § | |
| | § | |
| | § | |
| **GAINJET AVIATION, S.A.,** | § | |
| **CONSTANTIN** | § | |
| **NIYOMWUNGERE,** | § | |
| | | |
| *Defendants.* | | |

## <u>PLAINTIFFS' ORIGINAL COMPLAINT</u>

# TABLE OF CONTENTS

INTRODUCTION ................................................................................5

JURISDICTION AND VENUE ........................................................ 10

PARTIES ..........................................................................................10

FACTUAL BACKGROUND ............................................................12

I.   Kagame's Accension and Two-Decade Tyrannical Rule Over Rwanda ..... 12

    A.   Signs of Political Oppression Appeared Early after the RPF
       Assumed Control of the Government Post-Genocide.........................15

    B.   Violence, Threats, and Intimidation Surrounded Kagame's
       Initial Bid for Election in 2003 ...........................................19

    C.   Kagame's Strongman Tactics Were on Full Display Leading
       Up to the 2010 Election ....................................................24

         1.   The oppression of the FDU-Inkingi party and its
            members...........................................................25

         2.   The oppression of the PS-Imberakuri party and its
            members...........................................................28

         3.   The oppression of the Democratic Green Party and its
            members...........................................................29

         4.   The attempted assassination of Kayumba Nyamwasa and
            subsequent assassination of journalist Jean-Léonard
            Rugambage ......................................................31

         5.   The suppression of free speech and the media ........................32

D.  Kagame Continued to Oppress Political Opponents During His Second Term. ......................................................................34

E.  Kagame Prolonged His Authoritarian Rule By Pushing Through a Constitutional Amendment Extending the Term Limits For His Presidency. ......................................................................38

F.  Violence, Intimidation, and Abuse Ushered Kagame Into a Third Term in 2017. ...............................................................40

   1.  Kagame again targeted FDU-Inkingi members ......................41

   2.  Kagame again harassed and intimidated potential candidates ................................................................45

G.  Kagame's Political Opponents Continue to Disappear and Suffer Violent, Unexplained Deaths. ....................................45

II.  The Co-Conspirators' Abduction of Paul Rusesabagina ............................49

A.  The Rwandan Authorities' History of Persecuting Mr. Rusesabagina.....................................................................51

B.  The Co-Conspirators' Abduction and Extraordinary Rendition of Mr. Rusesabagina ...............................................61

C.  The Trumped-Up Charges Against Mr. Rusesabagina ......................67

CLAIMS FOR RELIEF ......................................................................74

COUNT 1:  Violation of the Torture Victim Protection Act (Against Constantin Niyomwungere) ................................... 74

COUNT 2:  Violation of the Alien Tort Statute: Forced Disappearance (Against Constantin Niyomwungere) ............ 76

COUNT 3:  Violation of the Alien Tort Statute: Torture and Other Cruel, Inhuman, or Degrading Treatment (Against Constantin Niyomwungere)........................................................ 79

COUNT 4:  Civil Conspiracy (Against Constantin Niyomwungere and GainJet) ............................................................ 81

COUNT 5:  Fraud  (Against Constantin Niyomwungere and GainJet) ...... 83

COUNT 6:  False Imprisonment (Against Constantin Niyomwungere and GainJet) ............................................................ 83

COUNT 7:  Intentional Infliction of Severe Emotional Distress (Against Constantin Niyomwungere and GainJet) ................. 84

COUNT 8:  Violations of International Law (Against Constantin Niyomwungere and GainJet) ................................................. 85

DAMAGES ..........................................................................................86

EXEMPLARY DAMAGES ...................................................................87

CONDITIONS PRECEDENT .............................................................. 88

JURY DEMAND ................................................................................. 88

PRAYER FOR RELIEF ........................................................................88

## INTRODUCTION

1.      This case arises out of a conspiracy of the Rwandan government and defendants GainJet and Constantin Niyomwungere to engage in the unlawful extradition, arbitrary detention, and torture of Paul Rusesabagina.    Mr. Rusesabagina is a lawful permanent resident of the United States and internationally acclaimed hero and human rights activist.  His efforts to save over 1,200 Rwandans from the 1994 genocide inspired the Academy Award nominated film, Hotel Rwanda. Mr. Rusesabagina has become yet another victim of Rwandan President Paul Kagame's practice of silencing political opponents and arbitrarily detaining them under the pretext of "terrorism."

2.      Mr. Rusesabagina is no terrorist.  His life's work is dedicated to bringing peace and democracy to Rwanda and motivating governments, non-governmental organizations, and ordinary people to work together to prevent genocide throughout the world.  As a testament to his dedication to human rights and a life of helping others, Mr. Rusesabagina has received numerous awards, including the United States Presidential Medal of Freedom in 2005, the nation's highest civilian accolade.

3.      As a natural consequence of his pursuit of human rights in Africa, Mr. Rusesabagina became a staunch critic of President Paul Kagame's government and

its abuses against the Rwandan people.  Mr. Rusesabagina became a target of Mr. Kagame in the early nineties, after he refused a position in Kagame's government. He then became a prime target after the release of the movie Hotel Rwanda, when Mr. Rusesabagina published his autobiography expressing concerns about human rights abuses by the Rwandan government. Targeting of Mr. Rusesabagina increased as he became an internationally known humanitarian and continued to speak out against Rwandan government human rights abuses, including when Mr. Rusesabagina spoke in support of the United Nations' Mapping Report in 2010. That report concluded that President Kagame and his government are responsible for war crimes and crimes against humanity in the Congo. The report also argues that there is enough evidence to investigate whether genocide is being committed by Rwandan forces against Hutu refugees in the Congo.

4.    As a result of these criticisms of Kagame and his government, Mr. Rusesabagina became the subject of harassment, threats against his life, at least one assassination attempt and a decades-long smear campaign by Mr. Kagame's government and its state-run media. As Mr. Rusesabagina himself wrote, "there is no greater gift to an insecure leader that quite matches a vague enemy who can be used to whip up fear and hatred among the population." Since 2005 Mr. Kagame

has tried to paint Mr. Rusesabagina as a "false hero" and has fraudulently labelled him a "terrorist" and "funder of terrorists" without any basis whatever in fact.

5.    This case arose after Mr. Kagame's attacks culminated in late August 2020, when Rwandan officials, in conspiracy with defendants GainJet and Niyomwungere, executed a covert mission to silence Mr. Rusesabagina permanently.

6.    Tapping into Mr. Rusesabagina's commitment to humanitarianism, GainJet, Niyomwungere, and Rwandan operatives hoodwinked Mr. Rusesabagina into leaving his home in San Antonio, Texas and flying to Dubai, United Arab Emirates. Defendant Niyomwungere told Mr. Rusesabagina that he was then going to board a private plane in Dubai to fly to Burundi, where he believed he was going to speak at churches and public gatherings about his experiences with genocide.

7.    Unbeknownst to Mr. Rusesabagina, Defendant Niyomwungere was a Rwandan government operative, and defendant GainJet, which owns and operates the private plane that Mr. Rusesabagina boarded in Dubai, has close ties with the Rwandan government and President Kagame personally. In coordination and conspiracy with Rwandan operatives, including defendant Niyomwungere, defendant GainJet had been paid by those officials and coconspirators to fly Mr.

Rusesabagina against his will to Kigali, Rwanda. Out of fear for his life, Mr. Rusesabagina had previously sworn that he would never return to Kigali again.

8.     After arriving at the Dubai airport from Chicago, Mr. Rusesabagina then boarded a GainJet aircraft that he was told and believed would take him to Burundi. Mr. Rusesabagina was flying to Burundi at the request and invitation of defendant Niyomwungere, who boarded the plane with him in Dubai to ensure that his plot succeeded.

9.     Referring to this abduction under false pretenses, President of Rwanda Paul Kagame publicly stated, "It was actually flawless!" Kagame admitted that "he brought himself — even if he may not have intended it."

10.     As the plane neared the Kigali airport, the coconspirators bound Mr. Rusesabagina. When Mr. Rusesabagina got off the plane, he was surrounded by armed Rwandan law enforcement, blindfolded, and tied at the hands and feet. The conspirators then tortured Mr. Rusesabagina by keeping him bound by his feet and hands, and keeping him blindfolded, for three days.

11.     Mr. Rusesabagina and his legal team were not informed of the official charges for many weeks. The Rwandan government recently indicted Mr. Rusesabagina on 9 charges related to alleged "terrorism." In fact, his only real "crime" is that he is a high-profile and effective critic of Kagame and his regime.

8

12.    Mr. Rusesabagina has denied all of the charges in court. He is currently being held in Nyarugenge prison, which according to human rights groups contains horrible conditions for inmates, including high threats of Covid infection. Pre-trial motions are typically not announced more than a day in advance. The show trial is scheduled to begin on January 26, 2021.

13.    Mr. Rusesabagina has since been unable to communicate freely with his family or an attorney of his choosing and has been denied speedy access to a court, the presumption of innocence, and adequate representation.

14.    Rwanda could lawfully obtain custody of Mr. Rusesabagina in the United Arab Emirates (or any other nation) only by extradition or deportation. When first announcing that it had detained Mr. Rusesabagina, the Rwandan government falsely stated the arrest was the result of "international cooperation" pursuant to an "international warrant."  The UAE quickly denied such cooperation, and the Rwandan government has provided no evidence of any legitimate international warrant—there is none.

15.    The Rwandan government, in conspiracy with GainJet and Constantin Niyomwungere, took Mr. Rusesabagina from Dubai to Rwanda outside of any legal process, and without any legal protections, including the opportunity to contest his removal from Dubai or any opportunity to claim asylum and contest his

9

return to Rwanda. Mr. Rusesabagina has a very well-founded fear of persecution in Rwanda. The conspirators' kidnapping and transfer of Mr. Rusesabagina to Rwanda lacked legal basis, in violation of article 9 of the Universal Declaration of Human Rights ("UDHR"), article 9 of the International Covenant on Civil and Political Rights ("ICCPR"), the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, and the common law. Their subsequent torture of him violated article 5 of the UDHR, article 7 of the ICCPR, the Torture Victim Protection Act ("TVPA"), note following 28 U.S.C. § 1350, and the common law.

## JURISDICTION AND VENUE

16.    This Complaint is for compensatory damages and injunctive relief based on the defendants' violation of international human rights law, the TVPA, the ATS, and the common law.

17.    This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1332(a)(2), and 1350.

18.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2).

## PARTIES

19.    Plaintiff Paul Rusesabagina is a citizen of Belgium and a lawful permanent resident of the United States, and divides his time between Belgium and his home in San Antonio, Texas.

10

20.     Plaintiff Taciana Mukangamije Rusesabagina is a citizen of Belgium and a lawful permanent resident of the United States, and divides her time between Belgium and her home in San Antonio, Texas. She is the wife of plaintiff Paul Rusesabagina.

21.     Plaintiff Anaise Umubyeyi Kanimba is a citizen of Belgium and a lawful permanent resident of the United States, who resides in Washington, D.C.. She is the daughter of plaintiff Paul Rusesabagina.

22.     Plaintiff Aimee-Lys Rusesabagina is a citizen of Belgium who resides in Alost, Belgium.  She is the eldest daughter of plaintiff Paul Rusesabagina.

23.     Plaintiff Carine Izere Kanimba is a citizen of Belgium and the United States who resides in the United States in New York. She is the daughter of plaintiff Paul Rusesabagina.

24.      Plaintiff Aimee-Diane Rusesabagina, is a citizen of Belgium who resides in Alost, Belgium. She is the daughter of plaintiff Paul Rusesabagina.

25.     Plaintiff Tresor Rusesabagina is a citizen of Belgium and a lawful permanent resident of the United States. He is the son of plaintiff Paul Rusesabagina.

26.     Plaintiff Roger Rusesabagina is a citizen of Belgium and the United States who resides in the United States in Billerica, MA. He is the elder son of plaintiff Paul Rusesabagina.

27.     Defendant GainJet is a corporation organized and existing under the laws of Greece, with its corporate headquarters located at Vouliagmenis Avenue & 1 Themistokleou St, 16674 Glyfada Athens – Greece. GainJet is licensed to do business in the United States and regularly does so.

28.     Defendant Constantin Niyomwungere is an agent of the secret service of the Rwandan Patriotic Front, led by Rwandan President Paul Kagame, and, on information and belief, a Rwandan citizen.

## FACTUAL BACKGROUND

### I.    KAGAME'S ASCENSION AND TWO-DECADE TYRANNICAL RULE OVER RWANDA.

29.     Rwanda may appear democratic, but this is nothing but a mirage.  For over two decades, the Rwandan people have lived under the rule of just one person, Paul Kagame—a former military leader whom human rights organizations and Rwandan political activists have vociferously condemned as a violent authoritarian who will stoop as low as necessary to ensure his continued unchecked power over the nation.

30.    Kagame rose to power through his leadership of the Rwandan Patriotic Front (RPF).  In 1990, the RPF, then a rebel group based in Uganda comprised of Tutsi refugees, initiated the Rwandan Civil War when they invaded northern Rwanda. The struggle continued for several years with neither side gaining a decisive advantage. On August 4, 1993, the Rwandan government, led by President Juvénal Habyarimana, signed a peace agreement with the RPF that planned for the establishment of a new transitional government that included the RPF and several other political parties.

31.    But following the death of President Habyarimana on April 6, 1994, Hutu extremists assumed control of the country. The extremists directed the immediate killing of Hutu and Tutsi political opponents and other prominent figures. The killings, carried out by the Hutu militia and the Presidential Guard, as well as ordinary citizens, did not end there.  The extremists began to target the entire Tutsi population, along with moderate Hutu. This marked the beginning of the Rwandan genocide that, over the course of several months, resulted in the death of approximately 800,000 Rwandans, both Tutsi and Hutu.

32.    The RPF emerged in opposition to the genocide. Led by Paul Kagame, the RPF was able to obtain control over all government territory and end the genocide. The post-genocide government took office in July 1994. Pasteur

13

Bizimungu was appointed president, while Kagame assumed dual roles as the country's Vice President and its Minister of Defense.

33.    In the last six months of 1994 following the conclusion of the genocide, Kagame's forces killed an additional approximately two to three hundred thousand Hutus, and caused hundreds of thousands more Hutus to flee the country.

34.    Over the next six years Kagame and the RPF consolidated political control of Rwanda, removing Hutu leaders through a variety of means, including harassment, arrest, physical threats, extrajudicial killings, and use of legal mechanisms to try opponents for corruption and other fabricated charges.

35.    Kagame became President of Rwanda in April 2000. He was initially elected to the position by the Rwandan parliament and its ministers, serving a three-year transitional term before being elected by the people in 2003 to a seven-year term under Rwanda's newly ratified constitution.[1] Kagame was then elected to a second, seven-year term in 2010. Kagame received 95% of the vote in 2003 and 93% in 2010, in elections marred by suppression of political parties, along with harassment, attacks upon and arrests of opponents. These elections were both viewed by the international community as highly flawed.

---

[1] *See e.g.,* Muhumuza, Rodney*, 25 Years After Genocide, Rwandan's Kagame is Praised, Feared*, Associated Press (Apr. 9, 2019) *available at* https://apnews.com/article/a97d40a146284383a717aa2ec42eb39b (last accesssed Dec. 12, 2020).

14

36.     In 2015, Kagame tightened his despotic grip on Rwanda by pushing through a constitutional amendment that enables him to stay in power through 2034. Leading up to that plebiscite, Kagame's political opponents disappeared and suffered violent deaths with shocking frequency.

37.     The most recent election, held in 2017, was once again marked by the suppression of free speech, violence, and intimidation of political opponents. Kagame was re-elected again, with a reported 98% of the vote.

38.     The "unexplained" disappearance, assassination, and oppression of Kagame's political dissenters continue, with Mr. Rusesabagina being among the latest victims.

### A.     Signs of Political Oppression Appeared Early after the RPF Assumed Control of the Government Post-Genocide.

39.     When the RPF came into power in 1994, the former Hutu government, military, and militias, along with over one million mostly innocent refugees, fled to neighboring Zaire[2] and other countries. Hutus continued to flee in large numbers throughout the remainder of 1994 and 1995 as RPF forces cracked

---

[2] Zaire is the neighboring country immediately to the west of Rwanda, and relations with this country are an important piece of current Rwandan history. It is important to note here that Zaire has been through several name changes: it was originally the Belgian Congo during its colonial period; then the Congo from independence in 1965 to 1971; the name was changed to Zaire from 1971 through 1997; and then changed again to its current name, the Democratic Republic of the Congo (often referred to as just "Congo" or "DRC".) This Complaint uses the names "Zaire" and "DRC."

down on Hutus in Rwanda to solidify their rule. In the end, more than two million Rwandans, predominantly Hutu, were living in exile.

40.    Human right violations by the Rwandan government were recorded almost immediately. These included significant casualties from attacks in which the Rwandan Patriotic Army (RPA), the new official army of the state, was implicated.  Over the course of several years, there were more than ten thousand victims. The Gersony Report, written by the representative of the UN High Commissioner for Refugees in 1994, details a number of RPA atrocities. This report became infamous because it was never formally released, but rather was buried by the UN's bureaucracy under political pressure from Rwanda and the United States.[3]

41.    The worst and most public of these atrocities was the Kibeho camp massacre in April 1995. Eyewitness accounts of the massacre by members of the Australian UN contingent note that the RPA surrounded the camp in western Rwanda, which they claimed was filled with Hutu insurgents who had taken part in the genocide, and proceeded to slaughter over 4,000 people. The killing included women executed in cold blood after surrendering, many killed by small arms and machetes, and a number of wounded men dumped into camp latrines and left to

---

[3] Des Forges (1999) has a good summary of the findings and controversy surrounding this report.

16

die. Despite the violence being witnessed by many, the Rwandan government never accepted responsibility, claiming that just over 300 people died as a result of violence in the camp. Some estimate that an additional twenty thousand or more died because they were forced to flee and leave the relative safety of the camp. Many observers also think it is unlikely that the displaced persons in the camp actually had any part in the genocide.[4]

42.    As evidenced by the assassination of Seth Sendashonga, attempting to speak out against the government's mistreatment of civilians was dangerous.  The RPF had recruited Sendashonga, a Hutu, to serve as a liaison to the predominantly Hutu political parties that opposed Habyarimana and his regime. When the RPF assumed power in July 1994, Sendashonga became Minister of the Interior.  But he left the government a little over a year later to protest abuses by the RPA against Rwandan civilians, most of whom were Hutu.  Sendashonga had asked Kagame, then Vice-President and Minister of Defense, to restrain his troops.  Sendashonga sent over 600 memorandums detailing the abuse and his concerns, but none were heeded.  Sendashonga eventually fled to Nairobi, where he lived in exile until he was assassinated on May 16, 1998.

---

[4] Testimony on the report can be found in Paul Jordan, "Witness to Genocide -- A Personal Account of the 1995 Kibeho Massacre" http://www.anzacday.org.au/history/peacekeeping/anecdotes/kibeho.html; Prunier's *The Rwanda Crisis: History of a Genocide* (1995) also discusses the specifics and political implications of Kibeho in-depth.

43.    Sendashonga was not the only Hutu to leave the Rwandan government to later speak out from exile about the abuses rampant within the RPF. The first Prime Minister and the Justice Minister, along with a number of diplomats, senior judges, and administrators did the same. As soon as they were safely out of the country, they voiced concern and criticism about the RPF's abuse of power, outrages by army and intelligence forces, insecurity, intimidation, and massive violations of human rights. There were also frequent accusations of discrimination against not only Hutus, but also Tutsi genocide survivors who were in Rwanda when the genocide occurred.

44.    This was followed in early 2000 by another wave of resignations. Joseph Sebarenzi, the speaker of the National Assembly, and Prime Minister Celestin Rwigema both resigned, fleeing and eventually ending up in the United States. President Pasteur Bizimungu also resigned two months later for personal reasons, apparently driven by increased accusations of corruption against any Hutus still in office. Upon his resignation, he was also accused of corruption, and was jailed before he could flee the country.

45.    The RPF regime was clearly in trouble following this spate of resignations, and they responded in a now familiar way by becoming even more repressive, and creating new rules to institutionalize that repression.

18

**B.      Violence, Threats, and Intimidation Surrounded Kagame's Initial Bid for Election in 2003.**

46.      The first presidential election following the adoption of Rwanda's new constitution was set for August 25, 2003. Kagame was selected as the candidate for the RPF, the country's largest political party. Initially, no one came forward as a candidate to challenge Kagame. But in March, Faustin Twagiramungu, Rwanda's first post-genocide prime minister and long-time leader of the *Mouvement Democratique Républicain* ("MDR"), Rwanda's second largest political party, announced his intention to run for president. Subsequent events leading up to the election drew the attention of human rights groups and raised concerns about the repressive tactics employed by the RPF to secure Kagame's victory.[5]

47.      On April 15, 2003, parliament, adopting a March 2003 commission report, voted to dissolve the MDR.[6]  The report accused the party of support and propagating "divisionist" ideology, writing that "In order for the state to carry

---

[5] *Rwanda: Escalating repression against political oppression*, Amnesty International (2003), *available at* https://www.amnesty.org/download/Documents/100000/afr470042003en.pdf ("*Escalating repression*"); *see also Preparing for Elections: Tightening Control in the Name of Unity*, Human Rights Watch (May 8, 2003), *available at* https://www.hrw.org/legacy/backgrounder/africa/rwanda0503bck.pdf ("*Preparing for Elections*").

[6] *Preparing for Elections* at 4-5; *See also* Republique Rwandaise, Assembleé Nationale, *Rapport de la Commission Parlementaire de controle mise en place le 27 decembre 2002 pour enqueter sur les problemes du MDR*, (Adopted April 15, 2003) ("*Rapport de la Commission*").

through its mission successfully, it should [be] unified in its actions."[7] The report also identified 46 individuals as supporters of the MDR divisionist ideology, many of whom were political or administrative figures in the Rwandan government. Those named included two government ministers, five deputies in the Transitional National Assembly, three high-ranking military officers, and an ambassador.[8]  The government ratified parliament's recommendation in May of that year.[9]

48.    The MDR decried the action, responding that "[t]he recent purge of MDR party members and alleged supporters prior to a scheduled May constitutional referendum along with the August presidential and October parliamentary elections, is a blatant infringement on these individuals' human rights."[10] Amnesty International issued a press release on April 22, 2003, stating, "The unfounded allegations against the individuals mentioned in the report appear to be part of a government-orchestrated crackdown on the political opposition."[11] Amnesty International further characterized the charge of "divisive ideology" as

---

[7] *Preparing for Elections* at 4-5, *citing Rapport de la Commission* at 19.

[8] *Preparing for Elections* at 7.

[9] *Le gouvernement approuve la dissolution du parti MDR*, Agence Rwandaise d'Information, Kigali,  May 19, 2003).

[10] *Escalating repression*.

[11] *Id*.

"vague terminology used by the government to disenfranchise the political opposition in an election year."[12]

49.    Amnesty International called on the Rwandan government to ensure the security of the individuals named in the March 2003 report, noting that "parliament's action endangers the lives and well-being of all those named in the report."[13]   Amnesty International noted that two high ranking military officers named in the report fled to Uganda on March 30, 2003, apparently fearing for their safety after having been informed that they would be accused of "divisionism" in the commission report.[14]

50.    Brigadier-General Emmanuel Habyarimana, former Minister of Defense, was one of those officers.   The day after he fled, Major Félicien Ngirabatware, personal friend to Habyarimana and the Director of the Ruhengeri Military School, was arrested and detained incommunicado at the Kami military detention facility outside Kigali.[15] Almost a year later, Ngirabatware was still

---

[12] *Id*.

[13] *Id*.

[14] *Id*., *see also Preparing for Elections* at. 8.

[15] *Id.*

missing.[16] Damien Musayidizi, Habyarimana's former secretary and secretary to then-current Minister of Defense, inexplicably disappeared two days after Ngirabatware's arrest.[17] These events prompted Amnesty International to conclude that "[i]t is clear that relatives, staff and friends of those names in the report are also at risk."[18]

51.    Léonard Hitimana, a parliamentary member associated with the MDR, disappeared on April 7, 2003. According to a news article by the Inter-Parliamentary Union ("IPU"), Hitimana was set to appear before parliament the next day to deny claims that the MDR party was divisive and fueling ethnic tension.[19] Eyewitnesses reported that Hitimana was stopped by agents from the Rwanda Directorate of Military Intelligence ("DMI") who then drove away with him.[20]   Hitimana's car later appeared on the Ugandan border, with its electrical

---

[16] *Fear for safety/Possible "disappearance"/incommunicado detention*Amnesty International (Mar.            16            2004),            available            at https://www.amnesty.org/download/Documents/92000/afr470032004en.pdf ("*Fear for safety*").

[17] *Preparing for elections* at 8.

[18] *Rwanda: EscalatingRepression against Political Opposition*, Amnesty International (Apr. 21, 2003), available at https://www.amnesty.org/en/documents/afr47/004/2003/en/.

[19] *Human rights cases: Leonard Hitimana, Rwanda*, Inter-Parliamentary Union (May 26, 2014), *available at* https://www.ipu.org/news/features/human-rights-cases/2014-05/leonard-hitimana-rwanda.

[20] *Id*.

cables cut, the keys missing from the ignition, and bloodstains on the front seat.[21] Rwandan authorities responded to inquiries from IPU about Hitimana's disappearance by stating that they believed he left the country after being accused of taking part in sectarian meetings. His party, however, believes that the car was placed there to make it look as if Hitimana had fled. It is believed that Hitimana was instead taken to Kami military camp, outside Kigali, where he was tortured and killed by DMI officer John Karangwa in May 2003.[22]

52.     Two weeks after Hitimana's disappearance, another high-profile dissenter went missing. Augustin Cyiza, a former military officer who served as president of the *Cour de Cassation* and vice president of the Supreme Court, was a strong opponent of the genocide and supported the RPF for many years before eventually breaking with the party. Cyiza was driving home with law student and cantonal judge, Elizier Runyaruka, after teaching a law class at the Université Libre de Kigali on April 23, 2003, when they both "disappeared."[23] Initially, Rwandese police had no information regarding Cyiza's whereabouts. They later gave conflicting reports on the location of Cyiza's car, telling family members that

---

[21] *Id*.

[22] Case Nº RW/06 – Leonard Hitimana, Resolution, IPU Governing Counsel (Apr. 1, 2010), *available at* http://archive.ipu.org/hr-e/186/Rw06.htm.

[23] *Preparing for Elections* at 9; *see also Fear for Safety*.

it was found in Butaro, near the Ugandan border, while indicating to others that the vehicle was found in Nkumba district.[24] But eyewitnesses claim to have seen Cyiza's car at Kanombe military camp on the night he disappeared. Cyiza remains missing and is presumed dead.[25]

53.     Kagame declared victory in the election on August 26, 2003.  But as one news article noted, "Mr. Kagame's government actively quelled any serious opposition in the motion leading up to the vote. Some seen as posing a threat to his hold on power were arrested. Others have disappeared. The leading opposition was forced to disband."[26] Having succeeded once in securing the public vote through repression, Kagame became even more oppressive.

**C.     Kagame's Strongman Tactics Were on Full Display Leading Up to the 2010 Election.**

54.     The disturbing trend of political repression was even more apparent during Kagame's second political campaign.  As noted by Human Rights Watch, the six months preceding this election were marked by "a worrying pattern of intimidation, harassment, and other abuses—ranging from killings and arrests to restrictive administrative measures—against opposition parties, journalists,

---

[24] *Id.*

[25]  *Fear for Safety.*

[26] Mark Lacey, *Rwandan President Declares Victory*, NY Times (Aug. 26, 2003), *available at* https://www.nytimes.com/2003/08/26/world/rwandan-president-declares-election-victory.html.

members of civil society and other critics."[27] Although Kagame faced off against three other candidates, these candidates and their parties were largely supportive of the RPF and were not seen to pose a serious challenge.[28]  The three political parties that openly criticized the RPF, the Democratic Green Party, the FDU-Inkingi, and PS-Imberakuri, were precluded from entering the race.[29]

### 1.    The oppression of the FDU-Inkingi party and its members.

55.    The Rwandan government's practice of silencing critics and political dissidents is widely known and has been consistently documented. Arresting political opponents has been the pattern and practice in Rwanda under President Paul Kagame.

56.    Concrete examples of this oppression of political opponents are numerous. For example, the African Court on Human and Peoples' Rights in *Ingabire Victoire Umuhoza v. Republic of Rwanda*, found that Rwanda had violated Ms. Umuhoza's freedom of opinion and expression. The government used the pretext of the law on genocide denial to unlawfully prosecute her for public

---

[27]    *Rwanda: Silencing Dissent Ahead of Elections*, Human Rights Watch (Aug. 2, 2010), *available at* https://www.hrw.org/news/2010/08/02/rwanda-silencing-dissent-ahead-elections ("Silencing Dissent").

[28] *Id*.

[29] *Id*.

25

statements. The African Court overruled all domestic courts that had been seized of the alleged crimes.[30]

57.     Ms. Umuhoza, president of the FDU-Inkingi opposition party, returned to Rwanda in January 2010 from the Netherlands to run against Kagame, but was precluded from doing so.[31] Following her return, she was repeatedly arrested and interrogated regarding alleged links to an anti-government armed group, her statements criticizing the government, and accusations that she supported genocide ideology.[32] On March 23, 2010 police detained Ingabire at the Kigali airport and prevented her from traveling abroad.[33]   She was arrested on April 21 and charged with several crimes against the government for which she would later be convicted.[34]   Her defense attorney, an American, was also arrested and denied bail.

---

[30]  ACtHPR, Umuhoza v. Rwanda, App. No. 003/2014, Judgement, 24 November 2017 [AFCHPR 21 (2018)] ("ACtHPR, Umuhoza v. Rwanda").

[31]  *Id.*; *see also* Edmund Kagire and Jason Straziuso , *Rwandan opposition candidate denied run for office*, AP (June 25, 2010), *available at* https://www.thenigerianvoice.com/news/28616/rwandan-opposition-candidate-denied-run-for-office.html ("*Rwandan Opposition Candidate Denied Run For Office*").

[32]  *Silencing Dissent*.

[33]  *Id.*

[34]  *Id.*; *see also Elections in Rwanda, Two decades of clamping down on critics*, Amnesty International, *available at* https://www.amnesty.org/en/latest/campaigns/2017/08/rwandas-repressive-tactics-silence-dissent-before-elections/.

58.     During her trial, Martin Ngoga, Rwanda's prosecutor general, told the press that evidence implicated Rusesabagina in Ms. Umuhoza's crimes, and that they planned to either indict him in absentia or summon him to testify.[35] But he was never summoned to testify, and no charges against him were ever made public.[36]

59.     The government also targeted other FDU-Inkingi members. On February 4, 2010, Joseph Ntawangundi was beaten outside a local government office in Kinyinya, Kigali. Several months later, the police arrested several FDU-Inkingi members in Kigali.  Although some of them were released the next day, three members were detained longer.  Many of those arrested reported being beaten while in police custody.  Ultimately, FDU-Inking was precluded from participating in the election after local authorities repeatedly denied the party permission to hold their congress meetings, a perquisite for officially registering as a political party. [37]

---

[35] Kezio-Musoke David, *"Hotel Rwanda" Hero Implicated in Terrorism Case*, Reuters (Oct. 27, 2010),                                                       *available                                                                     at* https://www.reuters.com/article/idUSTRE69Q4NB20101027?utm_source=feedburner&utm_medium=feed&utm_campaign=Feed%3A+reuters%2Fentertainment+%28News+%2F+US+%2F+Entertainment%29.

[36] *Id.*, *see also "Hotel Rwanda" manager accused of funding subversion*, BBC (Oct. 27, 2010), *available at* https://www.bbc.com/news/world-africa-11640808.

[37] *Id.*

27

2.      **The oppression of the PS-Imberakuri party and its members.**

60.     Before the election, the government also arrested and criminally charged the founder and president of the PS-Imberakuri party, Bernand Ntaganda.[38] He too would eventually be convicted. Police raided Ntaganda's house and the PS-Imberakuri office on June 24, 2003.[39] Several members of the party who had gathered outside the U.S. embassy, where they had gone to seek assistance following Ntaganda's arrest, were also arrested. Most of them were released the next day, but several others were detained longer. Party members reported that police broke up their gathering, instructed them to give up their membership in the party, and beat them while in custody.[40]  Sibomana Rusanagwa, Private Secretary to Ntaganda, went missing without explanation.

61.     Rona Peligal, Africa director at Human Rights Watch, observed that "[t]hese incidents are occurring at the very moment that parties are putting forward candidate for the presidential elections."  He further stated, "[t]he government is ensuring that opposition parties are unable to function and are excluded from the

---

[38] *Rwanda: Stop Attacks on Journalists, Opponents*, Human Rights Watch, (Jun. 26, 2010), *available at* https://www.hrw.org/news/2010/06/26/rwanda-stop-attacks-journalists-opponents ("*Rwanda: Stop Attacks on Journalists, Opponents*").

[39] *Id*.

[40] *Id*.

political process."[41] Peligal was not wrong. Like the FDU-Inkingi party, the PS-Imberakuri party was also unable to participate in the 2010 election. The July 2 submission deadline for registering presidential candidacies passed with the party's leader in jail.[42]

### 3. The oppression of the Democratic Green Party and its members.

62.    The leader of the Democratic Green Party and its members were subjected to similar treatment. Frank Habineza, the party's president, was threatened by an unknown assailant at a Kigali restaurant on February 4, 2010. And, as with the FDU-Inkingi party, the police repeatedly denied the Democratic Green Party permission to hold their congress meeting. Ultimately, the party was precluded from registering and, thus, could not enter a candidate in the election to run against Kagame.[43]

63.    In addition, First Vice President and founding member of the Democratic Green Party, Andre Kagwa Rwisereka, went missing on July 12, 2003.

---

[41] *Id.*

[42] *Silencing Dissent.*

[43] *Id.*; *see also Rwandan Opposition Candidate Denied Run For Office.*

He was found dead two days later with his head mostly severed from his body.[44]
Police initially stated that they believed Rwisereka was the victim of a robbery
because he was carrying a large sum of money.  But after this theory was disputed,
the police alleged that a financial disagreement had arisen between Rwisereka and
Thomas Ntivugurzwa, the last person with whom he was seen, that resulted in
murder.  Human Rights Watch reported that the events leading up to Rwisereka's
death suggested a political motive instead.  Rwisereka had expressed to friends and
colleagues that he feared his life was in danger due to his opposition to the RPF.
And he appeared increasingly concerned about his safety.  A few weeks before his
death, a former member of the Democratic Green Party visited Rwisereka and tried
to convince him to leave the party, telling him that the RPF would never allow him
to leave the "family."[45]  Rwisereka told those close to him that he perceived this as
a threat.[46]

---

[44] Josh Kron, *Rwanda Opposition Figure Found Dead*, New York Times (Jul. 14, 2010),
*available at* https://www.nytimes.com/2010/07/15/world/africa/15rwanda.html.

[45] Prior to helping found the Democratic Green Party, Rwisereka had been a long-standing
member of the RPF.

[46] *Rwanda Opposition Figure Found Dead*.

### 4. The attempted assassination of Kayumba Nyamwasa and subsequent assassination of journalist Jean-Léonard Rugambage.

64.    Another high-profile, violent attack was perpetrated on one of Kagame's dissenters about a month before Rwisereka was found murdered. Kayuma Nyamwasa, former Head of Rwandan Intelligence and ambassador to India, was shot in the stomach in Johannesburg, South Africa on June 19, 2010. Nyamwasa sought exile in South Africa in early 2010 after a falling out with Kagame. Kayumba made it known that he believed Kagame wanted him dead because he challenged Kagame's authoritarianism. Although Rwanda officials denied government involvement, the day after the assassination attempt Kagame stated at a rally that "[w]hoever betrays the country will pay the price, I assure you. …Whoever it is, it is a matter of time."[47]

65.    Five days later, on June 24, Jean-Léonard Rugumbage, a Rwandan journalist for *Umuvugizi*, an independent newspaper that often criticized the government, was shot dead in front of his home.[48]   And at the time of his death,

---

[47] *Rwanda, Repression Across Borders*, Human Rights Watch (Jan. 28, 2014) *available at* https://www.hrw.org/news/2014/01/28/rwanda-repression-across-borders; *see also Rwandan Nyamwasa murder plot: Four Guilty in South Africa*, BBC (Aug. 29, 2014), *available at* https://www.bbc.com/news/world-africa-28981317.

[48] *Rwanda: Stop Attacks on Journalists, Opponents*; *see also*Josh Kron, *Rwandan Editor who Accused Officials in Shooting is Killed*, New York Times (June 25, 2010), *available at*https://www.nytimes.com/2010/06/26/world/africa/26rwanda.html ("*Rwandan Editor who Accused Officials in Shooting is Killed*").

31

Rugumbage was investigating the attempted assassination of Nyamwasa in South Africa. And that morning *Umuvugizi* published an article by Rugumbage alleging the government's complicity in Nyamwasa's assault. Jean-Bosco Gasasira, *Umuvugizi*'s senior editor, blamed the government for Rugumbage's death.[49] Gasaria also stated that Rugumbage spoke to him repeatedly about being under surveillance in the week preceding his murder.[50]

### 5.     The suppression of free speech and the media.

66.    Rugumbage's murder was part of a larger pattern of government media censorship during the 2010 election.  On March 3, Deogratias Mushayidi, a former journalist and Kagame critic living in exile in Burundi, was arrested and extradited to Rwanda to stand trial on charges of plotting to overthrow the government.[51]   On April 13, the Rwandan Media High Counsel suspended two independent newspapers, *Umuseseo* and *Umuvugizi*, for six months.[52]   The following week *Umuvugizi*'s senior editor, Gasaria, fled the country after receiving

---

[49] *Rwandan Editor Who Accused Officials in Shooting is Killed*.

[50] *Id*.

[51] *Rwanda: Kagame Critic Mushayidi Jailed for Life,* BBC (Sep. 17, 2010), *available at* https://www.bbc.com/news/world-africa-11350976.

[52] *Rwanda: Stop Attacks on Journalists, Opponents*.

numerous threats.  A month later, *Umuseso*'s editor, who also received multiple threats, did the same.[53]   In July, the government arrested and detained several journalists from another newspaper, *Umurabyo*.[54]   On July 28, the government seized copies of *The Newsline*, an English newspaper run by *Umuseso* journalists from exile.[55]

      67.    Following the election, a U.S. Official with the National Security Council expressed concern over the treatment of the media and other "disturbing events" surrounding the 2010 election.[56] Spokesman Mike Hammer stated that "[w]e remain concerned, however, about a series of disturbing events prior to the election, including the suspension of two newspapers, the expulsion of a human rights researcher, the barring of two opposition parties from taking part in the election, and the arrest of journalists."[57]   The statement also indicated that the U.S.'s concerns had been conveyed to the Rwandan government in the hopes that

---

[53] *Id*.

[54] *Id*.

[55] *Id*.

[56] *"Disturbing Events' Marred Rwanda Leader's Re-election, U.S. Says,* Reuters (Aug. 14, 2010), *available at* https://www.nytimes.com/2010/08/15/world/africa/15rwanda.html.

[57] *Id.*

33

"leadership will take steps toward more democratic governance, increased respect for minority and opposition views, and continued peace."[58]

68.     The European Union also voiced its concerns. On August 6, 2010, the EU released a statement supporting the peaceful nature of the elections, but added that "in view of future elections, the EU expects further efforts to increase the inclusiveness and transparency of the process, in particular as regards the registration of the candidates, the tabulation of results and other prerequisites for achieving a level playing field." But Kagame paid no heed to these concerns and continued his descent toward dictatorship.

### D.     Kagame Continued to Oppress Political Opponents During His Second Term.

69.     There was no reprieve for political opponents following Kagame's victory in the 2010 election. Several opposition members were convicted of crimes against the state and sentenced to prison. Several others were assaulted or killed. Initially, the leaders of the FDU-Inkingi and PS-Imberakuri, both of whom were arrested during the 2010 election, were convicted and sentenced to prison. Ntaganda, who was charged with endangering national security, "divisionism," and attempting to organize demonstrations without authorization, was sentenced to four

---

[58] *Id.*

years in prison.[59]  Ingabire received an eight-year sentence after being charged

with multiple offenses linked to "terrorist acts" and "genocide ideology."[60]  There

were numerous allegations that witnesses had been detained and coerced by the

government.[61]

70.    In September 2011, Rwandan security personnel shot and injured a

PS-Imberakuri party member.  Authorities alleged that Eric Nshimyumuremyi was

shot because he was armed and looking for a fight. A party spokesman challenged

this narrative, claiming that Nshimyumuremyi was not armed as authorities

claimed, but was shot because he was a member of an opposition party.[62]

71.    Charles Ingabire, a Rwandan journalist was shot and killed on

November 30, 2011. Ingabire was the editor of *Inyenyeri News* and a vocal critic of

the Rwandan government. He was shot twice in the chest while leaving a bar in

---

[59] *Rwanda: Opposition Leader's Sentence Upheld*, Human Rights Watch (Apr. 27, 2012), *available at* https://www.hrw.org/news/2012/04/27/rwanda-opposition-leaders-sentence-upheld ("*Eight Year Sentence*").

[60] Human Rights Watch, *Rwanda: Eight-year sentence for opposition leader*, (Oct. 30, 2012), *available at* https://www.hrw.org/news/2012/10/30/rwanda-eight-year-sentence-opposition-leader; *see also Rwanda Opposition Leader Sentenced to Eight Years,* Reuters (Oct. 30, 2012), *available at* https://www.nytimes.com/2012/10/31/world/africa/rwanda-court-sentences-victoire-ingabire.html.

[61] *Eight Year Sentence.*

[62] *2010 Country Reports on Human Right's Practices – Rwanda*, United States Department of State,(Apr. 19, 2013), *available at* https://www.refworld.org/country,,,,RWA,,517e6de79,0.html ("State Dept. Rep.").

Kampala where he had gone to meet friends. Ingabire told his friend in the months leading up to his death that he had been threatened several times. About two months before he was killed, Ingabire was attacked and beaten in Kampala. The assailants, who also stole his computer, told Ingabire to close down his website.[63]

72.    In August 2012, Frank Ntwali, brother-in-law to Nyamwasa and chairperson of an opposition group in South Africa, was attacked outside Johannesburg. Ntwali was in his car and was stabbed repeatedly with a knife. Ntwali had been set to testify against the men on trial for attempting to assassinate Nyamwasa.[64]

73.    In October 2012, the former managing director of the Rwandan Development Board was found dead in Mozambique. Théogène Turatsinze was reported missing two days earlier. He was found tied up in ropes and floating in a lake. Police in Mozambique initially implicated the Rwandan government in Turatsinze's death, before retracting the statement.[65] According to a report issued

---

[63] *Uganda/Rwanda: Investigative journalists murder*, Human Rights Watch (Dec. 6, 2011)*, available at* https://www.hrw.org/news/2011/12/06/uganda/rwanda-investigate-journalists-murder; *see also Rwandan journalist Charles Ingabire killed in Uganda*, BBC (Dec. 2, 2011), *available at* https://www.bbc.com/news/world-africa-16012659.

[64] *Rwanda, Repression across borders*, Human Rights Watch (Jan. 28, 2014), *available at* https://www.hrw.org/news/2014/01/28/rwanda-repression-across-borders__("*Repression Across Borders*").

[65] State Dept. Rep.

by the U.S. Department of State, political observers commented that Turatsinze had access to politically sensitive information related to certain Rwandan government insiders.[66]

74.    In an incident following a similar pattern and practice to the one at issue here, Rwandan refugee Joel Mutabazi was kidnapped and forcibly returned to the country. Initially, Mutabazi, who was living in exile in Uganda, was reported missing on October 25, 2013.  His whereabouts were unknown for six days.  He reappeared in Rwanda police custody and was accused by Rwandan authorities of terrorism and other offenses.  Daniel Bekele of Human Rights Watch stated that "[i]t's unconscionable that they handed him over summarily to the police force of the country whose persecution he fled."[67]

75.    The former Head of Rwandan Intelligence, Patrick Karegeya, was assassinated in South Africa two months later on New Year's Eve.  Karegeya was found strangled in his hotel room.  Once a powerful figure in the Rwandan government, Karegeya fled to South Africa after he fell out with the regime.  Once in South Africa, Karegeya founded the Rwanda National Congress, an opposition

---

[66] *Repression Across Borders.*

[67] *Uganda/Rwanda: Forcible Return Raises Grave* Concerns, Human Rights Watch (Nov. 4, 2013), *available at* https://www.hrw.org/node/251643/printable/print.

group. His friends and family are certain he was murdered on Kagame's orders.[68] South African prosecutors chose not to pursue the men wanted for Karegeya's murder after discovering "close links" between the suspects and the Rwandan government.[69]   Kagame denied any involvement, but not long after the murder, commented, "[y]ou can't betray Rwanda and not get punished for it . . ..  Anyone, even those still alive, will reap the consequences.  Anyone. It is a matter of time."[70]

### E.     Kagame Prolonged His Authoritarian Rule By Pushing Through a Constitutional Amendment Extending the Term Limits For His Presidency.

76.    The constitution ratified by Rwandans in 2003 limited the office of the president to two seven-year terms. During his second term, Kagame began to hint at the possibility of his serving beyond those limits. Referring to inquiries about whether and when he planned to leave office, Kagame stated "I think at some point we need to leave countries and people to decide their own affairs."[71]

---

[68] Gabriel Gatehouse, *Patrick Karegeya: Mysterious Death of Rwandan Exile*, BBC (Mar. 26, 2014). *Available at* https://www.bbc.com/news/world-africa-26752838 ("Mysterious Death").

[69]Michela Wrong*, Suspects in Rwandan Spy Chief's Death 'linked to government'*, The Guardian (Jan. 21, 2019), *available at*; https://www.theguardian.com/world/2019/jan/21/letter-links-suspects-in-rwandan-spy-chiefs-death-to-government.

[70] *Mysterious Death*.

[71]  David Smith, *Paul Kagame hints at seeking third term as Rwandan president*, The Gardian (23 April 2014), *available at* https://www.theguardian.com/world/2014/apr/23/paul-kagame-third-term-rwandan-president.

He further stated, "let's wait and see what happens as we go. Whatever will happen, we'll have an explanation."[72]

77.    By November 2015, both houses of the Rwanda's parliament had unanimously approved a constitutional amendment that afforded Kagame the opportunity to seek re-election for one additional seven-year term and two additional five-year terms.[73] Rwandan citizens voted to approve the referendum on December 18, 2005, thus making it possible for Kagame to remain in power until 2034.

78.    The constitutional amendment drew international criticism, including censure from the United States.[74] In a press release, the U.S. Department of State criticized the plan to extend Kagame's term: "We do not support those in positions of power changing constitutions solely for their political self-interest."[75]   The British Minister for Africa, James Duddridge, questioned the manner in which the

---

[72] *Id.*

[73] *Rwanda: Referendum Approves Extended Presidential Terms*, Global Legal Monitor (Dec. 20, 2015), *available at* https://www.loc.gov/law/foreign-news/article/rwanda-referendum-approves-extended-presidential-terms/ ("*Referendum Approves Extended Presidential Terms*").

[74] Christina Krippahl, *Kagame's Third Term Bid Draws International Criticism*, Reuters (July 12, 2015), *available at* https://www.dw.com/en/kagames-third-term-bid-draws-international-criticism/a-18900414*.*

[75] *Referendum Approves Extended Presidential Terms* (quoting Press Release, John Kirby, U.S. Department of State, (Sep. 4, 2015)).

referendum was conducted, specifically noting that "[t]he short timeframe between the announcement of the referendum and the vote did not allow sufficient time for voters to consider and debate the proposed changes and for the case for and against to be made."[76]

79.    Kagame claimed to have resisted the efforts to extend his term, insisting that there was room for someone else to assume his role.[77] Speaking at the World Economics Forum on Africa in 2016, he stated, "I didn't ask for this thing," and indicated that he told his people, "[y]ou need to take a risk and look for someone else."[78] But the questionable manner in which the referendum was conducted and the consistent, repressive efforts of Kagame's regime to stifle his political competitors during his subsequent candidacy in 2017 belie his protestations.

---

[76] *Id*. (quoting Press Release, Foreign & Commonwealth Office & James Duddridge MP, (Dec. 21, 2015)).

[77] *I Don't Want Third Terms, Says Rwanda's Kagame,* Reuters (May 11, 2016), *available at* https://www.reuters.com/article/us-africa-economy-kagame/i-didnt-want-third-term-says-rwandas-kagame-idUSKCN0Y225T.

[78] *Id*.

**F.      Violence, Intimidation, and Abuse Ushered Kagame Into a Third Term in 2017.**

80.      Despite his professed reluctance hold onto power, Kagame announced his intention to run for a third term on January 1, 2016. Human Rights Watch chronicled the politically repressive environment in the 18 months leading up to the August 2017 election.[79]  Political opposition members were once again arrested arbitrarily, interrogated, and beaten. Some disappeared. The candidates themselves suffered harassment, threats, and intimidation. Journalists who spoke out against the regime were harassed and arrested. Citizens reported intimidation and voting irregularities at polling places. Given such tactics, it is no wonder that Kagame was able to boast a month before the elections, "I'm very pleased because we are already aware of the results of the elections . . ..  Anyone who says that results are not known is lying. The results were already known since December 2015 [when the constitutional referendum was approved]."

**1.      Kagame again targeted FDU-Inkingi members.**

81.      Three months after Kagame announced his candidacy, an FDU-Inkingi member was arrested after visiting the party's president, Ingabire, in prison.  Léonille Gasengayire was interrogated and beaten because of a book she

---

[79] *Rwanda: Politically Closed Elections*, Human Rights Watch (Aug.18, 2017), *available at* https://www.hrw.org/news/2017/08/18/rwanda-politically-closed-elections_("*Politically Closed Elections*").

attempted to bring Ingabire in prison.[80]   The same day that Gasengayire was arrested, another FDU-Inkingi member, Illuminée Iragena, was reported missing. Those close to her fear she was killed while in detention.[81]   Although Gasengayire is eventually released, she was re-arrested in August 2016 and charged with inciting insurrection or disorder in connection with her opposition activities as an FDU-Inkingi member. Gasengayire was detained for seven months in pre-trial detention before being acquitted and released. Several witnesses who testified at her trial reported being threatened.[82]

82.     Théophile Ntirutwa, the FDU-Inkingi representative for Kigali, was arrested in September 2016. He too suffered beatings during the subsequent interrogation about his membership in the party. He was released two days later.[83] In January 2017, FDU-Inkingi's vice president, Boniface Twarigmana, was repeatedly questioned by police regarding his alleged role in publishing information on the extrajudicial killings of Kagame's political opponents.[84]   He

---

[80] *Id.*

[81] *Id.*; *see also Rwanda: Opposition Activist Missing*, Human Rights Watch (Mar. 6, 2017), *available at* https://www.hrw.org/news/2016/09/29/rwanda-opposition-activist-missing.

[82] *Id*.

[83] *Id*.

[84] *Id*.

was arrested again in September 2017 and charged with various crimes against the government.

83.    The government continued its crack-down on the media, trampling Rwandans' right to free speech. One of the country's few investigative journalists, John Williams Ntwali, was arrested and accused of raping a minor in January 2016. The charges were later dropped for lack of evidence.[85]  Reporters Without Borders ("RSF") condemned the use of what it labeled as "trumped up charges" to intimidate Ntwali.  At the time of his arrest, Ntawli had been investigating several sensitive issues, including the death of Assinapol Rwigara, father of Diane Rwigara, who would late attempt to run for president.  This was not the first time Ntawali had been targeted.  He had been arrested on several prior occasions and also had his website blocked by the government in an apparent attempt to shut down his critical reporting.[86]

84.    A few days after Ntwali's arrest, police raided the office of the *East Africa* newspaper and confiscated computers belonging to two journalists. The computers belonged to Ivan Mugisha and Moses Gahigi, who were in the process

---

[85] *Id.*; *see also Investigative Reporter Freed Provisionally after Prosecutor Reduces Charge*, RSF (Feb. 10, 2016), *available at* https://rsf.org/en/news/investigative-reporter-freed-provisionally-after-prosecutor-reduces-charge.

[86] *Politically Closed Elections*.

of investigating cases of alleged tax evasion and corruption. Mugisha was arrested by police and questioned for several hours before being released.[87] Reporters Without Borders denounced the search, calling it an "act of intimidation."[88]

85.    Later that year, on October 8, Joseph Nkusi, a Rwandan blogger who wrote critically about the Rwandan government was arrested and questioned about his political activities and his blog.[89] A week later, Robert Mugabe, editor of the *Great Lakes Voice*, published an article alleging that he had been the victim of multiple kidnapping attempts in the preceding days.[90] Mugabe claimed that during the second incident he was intercepted by three men driving in a car who roughed him up and took his cellphone.[91] On August 8, 2016, journalist and singer John Ndabarasa was reported missing.[92]  Ndabarasa reappeared seven months later and

---

[87] *Id.*; *see also* RFI, *Rwanda: Many questions after the search of a newspaper*, Feb. 5, 2016.

[88] RFI, *Rwanda: Many Questions After the Search of a Newspaper*.

[89] *Politically Closed Elections*.

[90] *Id.*; *see also* Chris Kamo, *Rwandan Investigative Journalist Survives Kidnap, Phone Taken*, Global Post (2016), *available at* https://glpost.com/breaking-news-rwandan-investigative-journalist-robert-mugabe-survives-kidnap-phone-taken/.

[91] Chris Kamo, *Kagame Strikes Again – A Rwandan Investigative Journalist Robert Mugabe survives kidnapping* (Oct. 15, 2016), *available at* https://glpost.com/kagame-strikes-again-a-rwandan-investigative-journalist-bob-mugabe-survives-kidnapping/.

[92] *Politically Closed Elections*; *see alsoMissing Journalist Reappears in Rwanda*, Amnesty International (Mar. 13, 2017), *available at* https://www.amnesty.org/download/Documents/AFR4758582017ENGLISH.pdf.

spoke to local media, telling them he had fled the country out of fear of prosecution.[93]  But many were skeptical that this was the true explanation behind his disappearance.[94]

### 2. Kagame again harassed and intimidated potential candidates.

86.    As in 2010, PSI-Imberakuri president Ntaganda was arrested before the upcoming election. He was charged with disobeying the enforcement of law, organizing an illegal demonstration, and illegal formation and leadership of a political organization.[95]  A pro-government news outlet accused potential independent candidate, Philippe Mpayimana, of minimizing the genocide.[96] Diane Rwigara announced her intention to run in the election; three days later nude photos of her—which she alleged to be forgeries—appeared on social media.[97] Rwigara was eventually disqualified and not allowed to run.[98] Several other

---

[93] *Id.*

[94] *Rwanda: Opposition Activist Missing*,  Human Rights Watch (Sep. 29, 2016), *available at* https://www.hrw.org/news/2016/09/29/rwanda-opposition-activist-missing.

[95] *Rwanda: Politically Closed Elections*.

[96] *Id.*

[97] *Id.*; *see also* Busari, Stephanie, *Fake Nude Photos Were Used o 'Silence Me', Disqualified Rwandan Candidate Says,* CNN (Aug. 5, 2017), *available at* https://www.cnn.com/2017/08/04/africa/rwanda-election-nude-photos-candidate/index.html.

[98] *Id.*

candidates were also disqualified.  Kagame won the election with reportedly more than 98% of the vote, but many saw this as a reflection of an oppressive political environment rather than evidence of overwhelming support.[99]

### G. Kagame's Political Opponents Continue to Disappear and Suffer Violent, Unexplained Deaths.

87.     The pattern of violence and political oppression continued to mark Kagame as the dictator he has become.[100]  In three years since the 2017 election, many more political opponents have inexplicably "disappeared."  Others have been assaulted or killed.

88.     Twagirimana, the vice-president of FDU-Inkingi, went missing on October 8, 2018, while incarcerated in Muhanga.[101] Twagirimana was being detained while awaiting trial on charges linked to state security.  Rwandan authorities claimed he escaped, but friends and colleagues claim otherwise.  They

---

[99] Zack Baddorf,  *Rwandan President's Lopsided Re-election Is Seen as a Sign of Oppression*, New York Times (Aug. 6, 2017), *available at* https://www.nytimes.com/2017/08/06/world/africa/rwanda-elections-paul-kagame.html.

[100] *See e.g.*, Kara Fox, *Opposition members keep going 'missing' in Rwanda. Few expect them to return*, CNN (Jul. 27, 2019), *available at* https://www.cnn.com/2019/07/27/africa/rwanda-opposition-disappearances-intl/index.html ("*Opposition members keep going 'missing'*").

[101] Ida Sawyer,  *One Month Since Rwandan Opposition Leader Disappeared,* Human Rights Watch (Nov. 8, 2018), *available at* https://www.hrw.org/news/2018/11/08/one-month-rwandan-opposition-leader-disappeared.

allege that Twagirimana was abducted and taken away in a prison vehicle.[102]  He

has not been seen or heard from since, and his party fears him dead.[103]

89.    In March 2016, a member of Mr. Twagirimana's party disappeared,

and last May, a party representative's body was found mutilated. The party's

chairman is serving a 15-year prison sentence on charges of terrorism and

threatening national security, after running for president in 2010.[104]

90.    In July 2019, yet another member of FDU-Inkingi "disappeared."

Journalist Eugène Ndereyiama was on his way to a meeting in Nyagatare, but

never arrived.  Friends who were in communication with him while he was

traveling say that he never arrived.  He has not been seen or heard from since.[105]

91.    Anselme Mutuguimana, assistant to FDU-Inking leader Ingabire, was

found dead in a forest in northwestern Rwanda on March 3, 2019, with indications

---

[102] *Id.*

[103] *Opposition members keep going 'missing'.*

[104] A. L. Dahir, "'Hotel Rwanda' Hero, Paul Rusesabagina, Is Held on Terrorism Charge", The New York Times, 31 August 2020 ("31 August NYT Article"), available at <https://www.nytimes.com/2020/08/31/world/africa/paul-rusesabagina-hotel-rwandaarrest.html?auth=login-email&login=email> (last accessed 6 October 2020).

[105] *Disappearances Require Credible Investigations*, Human Rights Watch, (Aug. 15, 2009), *available at https://www.hrw.org/news/2019/08/15/rwanda-disappearances-require-credible-investigations*.

of strangulation. Mutuguimana had just been released in August 2018 after spending several years in prison for inciting insurrection.[106]

92.    Syldion Dusabumuremyi was stabbed to death on September 23, 2014 by two unidentified men.    Dusabumuremyi was FDU-Inkingi's national coordinator.[107]

93.    Then, on May 11, 2020, nine armed men entered the shop of FDU-Inkingi member, Theophile Ntirutwa, and stabbed Theoneste Bapfakurera to death, under the mistaken belief that he was Ntirutwa.[108]

94.    Human Rights Watch has called on Rwanda's international partners and the United Nation's secretary-general to demand transparent, credible investigations into these deaths and disappearances.[109]  To date, however, there has been no justice or reprieve for Kagame's political opponents.

---

[106] *Another Mysterious Opposition Death in Rwanda*, Human Rights Watch (Mar. 12, 2019), *available at* https://www.hrw.org/news/2019/03/12/another-mysterious-opposition-death-rwanda.

[107] *Killing is Latest Attack on Opponents*, Human Rights Watch (Sep. 24, 2019), *available at* https://www.hrw.org/news/2019/09/24/rwanda-killing-latest-attack-opponents___("*Killing is Latest Attack on Opponents*").

[108] Chris Kamo, *Rwanda: "Victorire Ingabire Should be Arrested at Least, Killed at Best,"* Global Post (Apr. 2020), *available at* https://glpost.com/rwanda-victoire-ingabire-should-be-arrested-at-least-killed-at-best/.

[109] *Killing is Latest Attack on Opponents*.

48

95.    In its most recent annual Report on Human Rights and Democracy around the World, the European Union described the political situation in Rwanda as "largely unchanged with continued reports of serious violations of civil and political rights and continued progress on social and economic rights."[110]  It goes on to describe the EU's key emphasis on "the area of the most serious violations of human rights – i.e. enforced disappearances, arbitrary detentions and use of torture and other inhuman or degrading treatments in detention facilities," as well as repeated infringement of political rights such as the rights to association and free speech.[111]

## II.    THE CO-CONSPIRATORS' ABDUCTION OF PAUL RUSESABAGINA.

96.    Paul Rusesabagina is a Rwandan humanitarian and activist and a citizen of Belgium.  Born to farmers in South Central Rwanda in 1954, Mr. Rusesabagina studied hotel management at Utalii College in Nairobi, Kenya.  After completing his education in Kenya and Switzerland, Mr. Rusesabagina joined Sabena Hotels, where he managed luxury hotels in Rwanda's capital, Kigali.

---

[110] EU Annual Report on Human Rights and Democracy in the World 2018 – Rwanda, European Union (May 21, 2019), *available at* https://eeas.europa.eu/delegations/rwanda/62839/eu-annual-report-human-rights-and-democracy-world-2018-rwanda_en.

[111] *Id.*

97.    As violence swept through Rwanda in 1994, Mr. Rusesabagina converted Kigali's Hôtel des Milles Collines into a safe haven, offering refuge to 1,268 Tutsis and moderate Hutus fleeing the Interahamwe militias.    As the Rwandan genocide raged outside the hotel's gates, no one in the hotel was injured or killed.  Mr. Rusesabagina's story inspired the Academy Award-nominated film Hotel Rwanda, which was met with international acclaim.

98.    Since his acts of heroism during the 1994 genocide, Mr. Rusesabagina has remained a tireless advocate for human rights and justice.  In 1996, he fled to Belgium, where he has citizenship, after an assassination attempt. In 2006, he published his autobiography, *An Ordinary Man*. Also in 2006 he founded the Hotel Rwanda Rusesabagina Foundation, a non-governmental and non-profit organization that supports survivors and victims of genocide and works to promote reconciliation and peace in Africa's Great Lakes region.

99.    Mr. Rusesabagina has also been an outspoken critic of the Kagame regime.  While Kagame has been lauded in some quarters for maintaining political and economic stability, his rule has also been marked by ongoing repression and gross human rights violations.

100.  Mr. Rusesabagina resides with his wife in San Antonio, Texas and Brussels, Belgium.  Both are lawful permanent residents of the United States.  All

six of their children are Belgian citizens; two of their children (Carine Izere Kanimba and Roger Rusesabagina) are dual citizens of the United States and Belgium.

101.   Mr. Rusesabagina has been the recipient of numerous prestigious awards, including the U.S. Presidential Medal of Freedom, awarded by President George W. Bush in 2005, the Tom Lantos Human Rights Prize, the University of Michigan's Raoul Wallenberg Medal, and the National Civil Rights Museum's Freedom Award.

**A.    The Rwandan Authorities' History of Persecuting Mr. Rusesabagina.**

102.   After Mr. Rusesabagina was awarded the Presidential Medal of Freedom, the United States' highest civilian award, the government of Rwanda began a smear campaign against Mr. Rusesabagina in an attempt to blunt his political influence.

103.   Following the award, the *New Times*, a Rwandan government-run newspaper, published a series of articles attacking Mr. Rusesabagina. For example, one of the articles was entitled "A man who sold the soul of the Rwandan

Genocide to amass medals." Months later, Mr. Kagame said Rwanda had no need for "manufactured" heroes "made in Europe or America."[112]

104.  Mr. Rusesabagina's 2006 memoir contained sharp criticisms of Kagame's regime. Mr. Rusesabagina wrote that Rwandan was "[a] nation governed by and for the benefit of a small group of elite Tutsis," and that "[t]hose few Hutus who have been elevated to high-ranking posts are usually empty suits without any real authority of their own."[113] He further stated that "[w]hat exists now in Rwanda is a new version of the akazu, or the 'little house' of corrupt businessmen who have long surrounded the president. The same kind of impunity that festered after the 1959 revolution is happening again, only with a different race-based elite in power."[114]

105.  Mr. Rusesabagina's book also questioned Rwanda's post-genocide progress towards democracy: "Rwanda has a cosmetic democracy and a hollow system of justice, and this is why I think it is far too soon to say Never Again for my country. We are not binding up the wounds of history. And I can assure you of

---

[112] Abdi Latif Dahir, Declan Walsh, Matina Stevis-Gridneff and Ruth Maclean, *How the Hero of "Hotel Rwanda" Fell into a Brutal Strongman's Trap*, New York Times (Sep. 18, 2020), *available at* https://www.nytimes.com/2020/09/18/world/africa/rwanda-paul-rusesabagina.html ("*Brutal Strongman*").

[113] Paul Rusesabagina, *An Ordinary Man*, Penguin (2006), at 199.

[114] *Id.*

this as a Rwandan: History dies hard."[115] Regarding Kagame, Mr. Rusesabagina stated that he "was the general of the [RPF] army that toppled the genocidaire regime and ended the slaughter, and for this he deserves credit.  But he has exhibited many characteristics of the classic African strongman ever since taking power."[116] In particular, Mr. Rusesabagina questioned the integrity of the 2003 election results showing that Kagame won 95% of the vote: "There is nobody in the world that can call results like that a 'free election' and keep a straight face."[117] He also claimed that Rwanda's parliament was essentially a "rubber stamp for the will of the president."[118]

106.   Also in 2006, Mr. Rusesabagina founded the PDR-Ihumure political party, and as the PRD representative he currently serves as the Vice President of the Rwanda Movement for Democratic Change (MRCD), a coalition of opposition groups in exile that includes the PDR-Ihumure.  The emphatic focus of MRCD is to seek democratic change and highlight the plight of millions of Rwandan refugees and exiles, like Mr. Rusesabagina, who remain trapped outside the

---

[115] *Id.* at 200.

[116] *Id.* at 198-99.

[117] *Id.* at 199.

[118] *Id.*

country more than a quarter century after the genocide. In the words of Mr. Rusesabagina: "We wanted to wake up the international community, foreign countries and Rwanda itself." "To remind them that we also exist."[119]

107.  Mr. Rusesabagina has continually and forcefully criticized the Kagame regime. In a January 2007 interview with Reuters, he stated that "[a]ctually we are not very far from another genocide."[120] He also questioned the effectiveness of the genocide trials, telling the reporter that "[a]s long as justice is not done there will be no reconciliation," that "[t]he justice in place is biased," and that "[t]hey are focusing on cases of Hutus who killed Tutsis but not Tutsis who killed Hutus."[121]

108.  A few months later, Mr. Rusesabagina referred to Kagame during another interview as a "war criminal." He accused Kagame of killing innocent Hutu citizens.  He also noted that Kagame labeled anyone who spoke out against him as an enemy and would "come after" them.  Mr. Rusesabagina went on to list several examples of both Hutu and Tutsi officials assassinated by Kagame.  He

---

[119] *Brutal Strongman.*

[120] John Chiaemen, *"Hotel Rwanda" hero fears new Hutu-Tutsi killings*, Reuters (Jan. 21, 2007), *available at* https://www.reuters.com/article/us-rwanda-rusesabagina/hotel-rwanda-hero-fears-new-hutu-tutsi-killings-idUSL1192073920070111.

[121] *Id.*

stated, "You see a clear pattern of—what would you call it, genocide? murder? assassinations? —state orchestrated terrorism that has occurred under the Kagame government since 1994."[122]

109.   In June 2007, Mr. Rusesabagina reported Mr. Kagame to an international tribunal on war crimes in Rwanda, for atrocities he said had been committed by Mr. Kagame's troops during the genocide.

110.   Mr. Rusesabagina also laid out his concerns about Kagame's regime to U.S. Speaker of the House, Nancy Pelosi, and other lawmakers. He called into question the integrity of the presidential elections and the effectiveness of the *gacaca* courts.   He also pointed out the under-representation of Hutus among government officials, the extreme overcrowding of Rwanda's prisons, and the excessive delays experienced by many prisoners awaiting trial. Mr. Rusesabagina accused Kagame of employing a sinister intelligence agency to silently suppress Rwandans by bringing charges against or kidnapping dissenters.

111.   In an effort to undermine Mr. Rusesabagina's credibility, pro-government Rwandan media reacted to his public rebuke of the regime with an onslaught of news articles viscously attacking his character. *New Times* published

---

[122] Keith Harmon Snow, *The Grinding Machine: Terror and Genocide in Rwanda*, Toward Freedom (Apr. 24, 2007), *available at* https://towardfreedom.org/story/archives/africa-archives/the-grinding-machine-terror-and-genocide-in-rwanda/.

21 articles over a six-month period with headlines like "Rusesabagina's Megalomania Has No Limit," "Rusesabagina's dishonest behavior," and "Paul Rusesabagina created a hoax charity to enrich himself."   In reporting on Mr. Rusesabagina's statements to ICTR, a July 2007 article in *New Times* charged him with "milking the 'sacred cow' in the name of Genocide."[123]   And among many other things, these articles accused Mr. Rusesabagina, falsely, of exaggerating his role and profiting from the genocide.

112.   Mr. Rusesabagina's outspoken criticism of the Kagame regime, combined with his high profile following the success of Hotel Rwanda, has caused the government to try to discredit, smear, and silence him.

113.   The government has repeatedly tried to damage Mr. Rusesabagina's image by promoting revisionist histories of what happened inside the Hôtel des Milles Collines.   Despite numerous accounts that confirm Mr. Rusesabagina's acts of heroism, the government has tried to paint him as a "false hero" created by Hollywood, even resorting to bribing some of the witnesses to publicly support this

---

[123] Times Reporter, *Rusesabagina propogates ill-fated political manoeuvres*, The New Times (July 26, 2007), *available* at https://www.newtimes.co.rw/section/read/616.

narrative.   Kagame himself, soon after *Hotel Rwanda* was released, called the stories of Mr. Rusesabagina's heroism "totally false."[124]

114.   The government has labeled Mr. Rusesabagina a genocide negationist, genocide ideologist, and genocide denier.   For example, in January 2020, *New Times* called him "a known denier of the 1994 Genocide."[125]   Of course, nothing could be further from the truth – Mr. Rusesabagina is a sought-out speaker about the horrors of the 1994 genocide. But he speaks about the genocide in a way that deviates from the one-sided, sanitized, and simplified narrative propagated by the government – he acknowledges that both Tutsis and Hutus were killed in the genocide, and that the RPF committed atrocities when it took control of the country. His family also experienced the horrors of the Genocide first-hand: he and his wife adopted Anaise and Carine after their parents were murdered in the Genocide.

---

[124] Max Bearak, *Paul Rusesabagina, of 'Hotel Rwanda' Fame, Arrested on Terrorism Charges*, Washington Post (Aug. 31, 2020) *available at* https://www.washingtonpost.com/world/africa/paul-rusesabagina-of-hotel-rwanda-fame-arrested-on-terrorism-charges/2020/08/31/24e6d5ca-eb7c-11ea-bd08-1b10132b458f_story.html ("Just a few months after the film [Hotel Rwanda] was screened in front of thousands in Kigali's biggest stadium, Kagame called Rusesabagina a 'manufactured hero.'  'He should try his talents elsewhere and not climb on the falsehood of being a hero, because it's totally false,' the president said.").

[125] James Karuhanga, *Uproar as Rusesabagina is Given Platform to Negate Genocide Against Tutsi*, The New Times (Jan. 5, 2020), *available at* https://www.newtimes.co.rw/news/uproar-rusesabagina-given-platform-negate-genocide-against-tutsi.

115.   Mr. Rusesabagina's positions on the 1994 genocide, which have been documented and confirmed by humanitarian and aid groups, scholars, and UN reports, have earned him the ire of the Kagame regime.  While the government's accusations are ridiculous, they are serious – genocide denial and similar acts are crimes in Rwanda with significant prison terms.[126]

116.   The government has also repeatedly accused Mr. Rusesabagina of other criminal conduct.  For example, Rwanda's Ambassador to the United States, James Kimonyo, stated at a forum in Chicago that Mr. Rusesabagina purchased guns in South Africa in 2007 to aid rebel groups in the Congo – an accusation that has been repeated by the state-owned *New Times*.  Yet no evidence was ever produced—none exists—and no criminal charges were ever filed.

117.   Similarly, starting in 2010, government spokespersons and *New Times* began asserting that Mr. Rusesabagina was funding the Forces démocratiques de libération du Rwanda ("FDLR"), a Hutu rebel group based in Congo that is considered a terrorist organization.  Mr. Rusesabagina called these allegations a "baseless" attempt by the government to tarnish his reputation, and

---

[126] *Law on the Crime of Genocide Ideology and Related Crimes*, No. 59/2018(Aug. 22, 2018), at Arts. 5–7 (Rwanda), *available at* https://minijust.gov.rw/fileadmin/Laws_and_Regulations/Law_on_Cyber_crimes_2018.pdf (denial of genocide, minimization of genocide, and justification of genocide are each punishable by 5 to 7 years' imprisonment).

unequivocally stated, "I have sent no money to terrorists." Contending that the prosecutor was lying, he further averred that "[t]his is pure and simple fabrication from Kigali."[127] Indeed, no evidence was ever brought forth to prove the government's claim—none exists. Mr. Rusesabagina's current detention and the alleged charges that appear will be brought against him are little more than a repackaging of these same false allegations.

118.   Lodging false charges against political opponents is a trademark of Kagame's authoritarian rule. Accusing Mr. Rusesabagina of crimes against the government perpetuates a clear pattern employed by the RPF to silence and suppress political opposition.  As detailed above, the government has repeatedly used this tactic to harass, intimidate, and ultimately incarcerate other Kagame critics.

119.   Mr. Rusesabagina also endured a series of violent attacks.   In Brussels, intruders broke into his home three times.  He has received death threats and survived an assassination attempt.

120.   After Mr. Rusesabagina moved to the United States in 2007, Kagame continued to monitor him. Government agents regularly attended his public

---

[127] Faith Karimi, *"Hotel Rwanda" hero denies sending money to rebels, CNN* (Oct. 29, 2010), *available at*
https://www.cnn.com/2010/WORLD/africa/10/28/rwanda.terror.allegations/index.html.

lectures, frequently attempting to disrupt them. Mr. Rusesabagina told Voice of America's Africa 54, "I can tell you that I never felt safe since 2000."[128]

121.   None of this has deterred Mr. Rusesabagina's efforts to bring the Kagame regime's criminality to the attention of the world media. In a 2016 interview with the Washington Post, for example, Mr. Rusesabagina stated that "[t]he government we had in 1994 was a horrible dictatorship. It has been replaced by an equally cruel but more polished dictatorship."[129]

122.   Mr. Rusesabagina contemplated running against Kagame in the 2017 presidential election, expressing his desire to "combine humanitarian with political action to liberate Rwandan people from the dictatorship."[130] He continues to advocate for democratic change, justice, and sustainable peace in Rwanda, and calls upon Western leaders to use their influence to pressure Kagame and the

---

[128] *Daughter of Rwandan 'Genocide Hero' Pleads. For His Release*, VOA News (Sep. 5, 2020), *available at* https://www.voanews.com/africa/daughter-rwandan-genocide-hero-pleads-his-release.

[129] Pamela Constable, *Hotel Rwanda hero decries oppression two decades after genocide*, The Washington Post (Jan. 28, 2016), *available at* https://www.washingtonpost.com/local/social-issues/hotel-rwanda-hero-decries-oppression-two-decades-after-genocide/2016/01/28/4dc33e20-c5f7-11e5-a4aa-f25866ba0dc6_story.html.

[130] Bill Lambrecht, *African hero, now living in S.A., will run for Rwandan presidency*, San Antonio News-Express (Jan. 28, 2016), *available at* https://www.expressnews.com/news/local/article/African-hero-now-living-in-S-A-will-run-for-6791393.php.

Rwandan government to respect human rights, restore political freedoms, and allow fair elections.

123.   For his efforts, Mr. Rusesabagina now finds himself facing charges of terrorism. But this is just routine practice for the Kagame regime. As Human Rights Watch recently highlighted: "President Paul Kagame and other senior government officials, regularly threatened those who criticize the government or the RPF,"[131] and in 2019, "[s]everal opposition members and one journalist disappeared or were found dead in mysterious circumstances."[132]   In addition, "[s]tate interference and intimidation have forced many civil society actors and journalists to stop working on sensitive political or human rights issues."[133]

**B.   The Co-Conspirators' Abduction and Extraordinary Rendition of Mr. Rusesabagina.**

124.   In 2020, a man who identified himself as Bishop Constantin Niyomwungere contacted Mr. Rusesabagina at his home in San Antonio, Texas and invited him to speak at churches in Burundi about the Rwandan genocide and *Hotel Rwanda*.   Defendant Niyonwungere is a Rwandan citizen. The events to which he purported to invite Mr. Rusesabagina were not political.   Mr.

---

[131] *Rwanda: Events of 2019*, Human Rights Watch, accessed Sept. 6, 2020, available at https://www.hrw.org/world-report/2020/country-chapters/rwanda.

[132] *Id*.

[133] *Id*.

Rusesabagina was to speak only about his personal experiences in 1994, which he frequently does with schools, universities, and churches.  The visit was intended to be short – from August 26, 2020 to September 2, 2020.

125.   Without Mr. Rusesabagina's knowledge, Kagame, the government of Rwanda, and defendants Niyonwungere and GainJet had joined together in a conspiracy to lure Mr. Rusesabagina to Dubai, to abduct him there, to deliver him to Rwanda, to subject him to torture, and to hold him as a captive to stand "trial."

126.   On August 26, 2020, as the conspirators knew and intended, Mr. Rusesabagina flew from San Antonio to Chicago to Dubai, United Arab Emirates on Emirates Airlines. The coconspirators had led Mr. Rusesabagina to believe that, in Dubai, he would take a private jet hired by Niyomwungere to Bujumbura, Burundi.  He arrived in Dubai just before 7:00 pm local time on August 27.  Later that night, around 11:00 pm, he contacted his family to let them know he had arrived safely.  That was the last time the family heard from him for more than eleven days.  His wife and children attempted to reach him through a variety of ways over the following days but were unable to do so.

127.   Pursuant to the coconspirators' prearranged plan, defendant GainJet took Mr. Rusesabagina to Kigali, Rwanda on a Bombardier Challenger 605 Plane (Tail # SX-FSA) The GainJet aircraft that unlawfully held Mr. Rusesabagina left

Dubai at 12:55 am local time and arrived in Kigali, Rwanda at 4:50 am local time. Under international standards and other applicable law, the GainJet pilot and co-pilot had control of and responsibility for the safety of all passengers on board.  In full view of those GainJet employees, as the plane began preparation for landing in Kigali (the Defendants and their coconspirators had led Mr. Rusesabagina to believe in Burundi) Mr. Rusesabagina hands were bound. Pursuant to its agreed participation in the conspiracy, GainJet and its employees and agents did not issue any international "Mayday" call or "squawk '7700'" on the radio—the internationally recognized code for distress or an emergency situation in flight.

128.   As of 2018 GainJet owned and operated 11 charter jets and logged about 5561 flight hours for 2018.  Like many Greek companies, the recession forced the struggling GainJet to survive by seeking new clientele outside its country's borders.

129.   The growing nation of Rwanda had presented itself as a particularly lucrative opportunity. GainJet has been vocal in its support of Rwanda and the importance of that country to GainJet's business. In 2016, GainJet's CEO stated that "[w]e've established an office in Rwanda. Surprisingly it stood out, and is stable with good security. It's the Switzerland of Africa and very different from Kenya now, for example. We're focusing on Rwanda and fly to Kigali quite often;

we may permanently base [another] aircraft there, a Challenger." [134]   The Challenger is the plane that GainJet and the other coconspirators used to abduct Mr. Rusesabagina.

130.   Through its social media, GainJet proudly showcases its dealings in Rwanda.  It frequently provides charter flights for Rwandan government officials, and it even boasts about President Kagame being among its customer base.

131.   GainJet has an especially close and reciprocal connection to Kagame. In 2011, Kagame transferred his planes from South Africa to Greece, where GainJet is located. Then in 2014 GainJet opened its African headquarters in Kigali.

---

[134] Ian Sheppard, *After Surviving Recession, GainJet Widens Outlook*, MEBAA Convention News (Dec. 2, 2016), *available at* https://www.ainonline.com/aviation-news/business-aviation/2016-12-02/after-surviving-recession-gainjet-widens-outlook.



132.  Pursuant to the conspiracy, GainJet unlawfully flew Mr. Rusesabagina

to Kigali, Rwanda, where it delivered him to additional coconspirators, including

Rwandan security personnel. Those coconspirators, who immediately arrested Mr.

Rusesabagina, tied him at the legs and hands and covered his face. They then took

him to an unknown location for three days.

133.  Throughout this three-day ordeal, the coconspirators tortured Mr.

Rusesabagina by keeping him constantly bound and blindfolded. Throughout this

detention and interrogation, the coconspirators physically and psychologically

tortured Mr. Rusesabagina. They also denied him access to family, friends, counsel, and any diplomatic or consular officials.

134.   Between 27 and 31 August 2020, Rwandan authorities gave no reason for Mr. Rusesabagina's detention.

135.   On August 30, 2020, Rwandan authorities notified Belgium that it had detained a Belgian citizen, but did not identify the victim.

136.   On August 31, 2020, the government paraded Mr. Rusesabagina in front of the Rwandan media as a prisoner at the Remera Police Station. That same day, the Rwanda Investigation Bureau ("RIB") announced via its Twitter account and official website that Mr. Rusesabagina had been taken into custody through "international cooperation" as the "subject of an International Arrest Warrant."[135] The announcement also stated that he was wanted by Rwandan authorities "to answer charges of serious crime including terrorism, arson, kidnap and murder, perpetrated against unarmed, innocent Rwandan civilians on Rwandan territory . . . including in Nyabimata - Nyaruguru district in June 2018 and in Nyungwe - Nyamagabe district in December 2018."[136]

---

[135] Tweet by Rwanda Investigation Bureau (@RIB_Rw), TWITTER, Aug. 31, 2020, 4:30 am, available at: https://twitter.com/RIB_Rw/status/1300350300377710594.

[136] *Id*.

137.    Mr. Rusesabagina was not in fact the subject of any lawfully issued international arrest warrant. There is no public Interpol Notice for Mr. Rusesabagina. And despite international outcry, the government has not produced the warrant that it claims legitimizes the kidnapping of Mr. Rusesabagina.

138.    Moreover, the UAE does not have an extradition treaty with Rwanda, and has denied any role in Mr. Rusesabagina's abduction.

139.    The government of Rwanda has suggested that the Belgian and United States intelligence communities congratulated the Rwandan government for the abduction, and has stated that "they were only surprised how we could conduct such an operation, and very successfully."[137] That was another lie. Belgium and the United States have denied any involvement in or prior knowledge of the operation.[138]

140.    Plaintiffs know of no legal basis for the arrest.    The arrest circumvented lawful extradition and deportation procedures, and Mr. Rusesabagina would not have been arrested had those procedures been followed.

---

[137] *Brutal Strongman.*

[138] *Id.*

## C.      The Trumped-Up Charges Against Mr. Rusesabagina.

141.    On September 1, 2020, RBI spokesperson Thierry Murangira stated that a Rwandan investigator had "15 days to determine whether Rusesabagina should stay in custody, that he has the right to a lawyer, and the right to speak to his family."[139] After learning of Mr. Rusesabagina's detention, his wife called the Remera Police Station and requested to speak with him. That request was denied. A local lawyer hired by his family twice tried to visit but was denied access each time.

142.    For the first 11 days after the abduction, Mr. Rusesabagina was held incommunicado, unable to communicate with his family, authorized counsel, or Belgian diplomats.

143.    On September 5, Rwandan lawyer David Rugaza appeared in a press conference, claiming that he was Mr. Rusesabagina's counsel.[140] The "press conference" was held only in Kinyarwanda with only state media in attendance. Mr. Rusesabagina's daughter, Carine Kanimba, told media that Mr. Rugaza "is a

---

[139] Caroline Faraj et al., *UAE Denies Knowledge of Hotel Rwanda Film Hero's Arrest as Family Raise 'Kidnap' Fears*, CNN (Sept. 2, 2020), *available at* https://www.cnn.com/2020/09/02/africa/paul-rusesabagina-rwanda-arrest-intl/index.html.

[140] *Paul Rusesabagina ameze neza | Ni we wahisemo ko mwunganira | Me Rugaza David*, RwandaTV (Sep. 5, 2020), *available at* https://www.youtube.com/watch?v=ddDgF2PXRPc.

fake lawyer chosen by Kagame's people."[141] Also reaffirming that this lawyer was acting against Mr. Rusesabagina's interest is the fact that the lawyer appeared to welcome the legal process in Rwanda beginning, rather than insisting any process of any kind would be illegal because of an extraordinary rendition.   And Mr. Rugaza held a press conference only in Kinyarwanda, Rwanda's national language, and only for the state-run Rwanda TV, run by the Rwanda Broadcasting Agency, which posted it on YouTube.  As a result, no foreign journalists who did not speak Kinyarwanda knew about or reported on the press conference. This was against Mr. Rusesabagina's best interests, because it minimized international publicity regarding his extraordinary rendition.

144.   On September 6, President Kagame appeared on national television and discussed Mr. Rusesabagina's case. The essentially admitted the unlawful abduction and rendition: "You will be surprised how he got here . . .. It (the plan)

---

[141] *Hotel Rwanda' Hero Returned To Country Of Own Accord: Kagame*, Barron's (Sep. 6, 2020), *available at* https://www.barrons.com/news/hotel-rwanda-hero-returned-to-country-of-own-accord-kagame-01599411304.

was actually flawless!"[142]  "He got here on the basis of what he believed he wanted to do and he found himself here."[143]

145.   Kagame insisted that Mr. Rusesabagina "heads a group of terrorists that have killed Rwandans. He will have to pay for these crimes. Rusesabagina has the blood of Rwandans on his hands."[144]

146.   Those are yet more lies. Mr. Rusesabagina has repeatedly denounced any participation in terrorist organizations or activities. Contrary to what Rwandan officials allege, it is another political party in the MRCD coalition —not Mr. Rusesabagina's RDP-Ihumure party—that controls the National Liberation Front (FLN), an armed group accused of carrying out attacks in Rwanda in 2018 along Rwanda's border with Burundi and that has been cast as terrorist organization. MRCD leaders have stated that they have no control over the actions of party members, including the FLN.

147.   Rwanda has accused Mr. Rusesabagina of leading and funding the FLN and its violence. Mr. Rusesabagina's role in the MRCD has always been

---

[142] *Rwanda's President Says 'Hotel Rwanda' Hero Must Stand Tri*al, New York Times (Sep. 6, 2020), *available at* https://www.nytimes.com/aponline/2020/09/06/world/africa/ap-af-rwanda-hotel-rwanda-arrest.html.

[143] *Paul Rusesabagina: President Denies Hotel Rwanda Hero was Kidnapped*, BBC(Set. 6, 2020), *available at* https://www.bbc.com/news/world-africa-54050510.

[144] *Id.*

diplomacy and has had nothing to do with the management of the FLN or its activities.

148.   Neither Mr. Rusesabagina nor his organization ever authorized or participated in any terrorist or unlawful conduct. In a May 2020 letter, signed by Mr. Rusesabagina and other Presidents of the subsidiary MRCD parties, the MRCD accused CNRD, the party controlling FLN, of violating MRCD constitution for FLN's alleged conduct. The MRCD subsequently expelled CNRD and its militant wing, after they refused to answer to MRCD's accusations.

149.   Mr. Rusesabagina has acknowledged that he sent E3000 to CNRD's Gen. Irategeka, but said he sent it out of kindness after he pleaded to him for support. The money was not intended to support the FLN or an armed group. Rusesabagina's family has previously sent E970 to another person from the same village as Rusesabagina's family member—that person happened to be associated with the FLN, but the family plainly intended that money merely to help the villager survive.

150.   Since his abduction, Mr. Rusesabagina's physical appearance has changed drastically—owing to the inhumane conditions of Rwandan prison. In the first three days after his disappearance, Mr. Rusesabagina was held captive in an unknown location, bound hand and foot and blindfolded. His family has not been

allowed regular contact with him, but knows that he has been hospitalized at least three times since August 31, 2020, and that Rwandan doctors have changed his medications without outside medical consultation and deprived him access to medication sent by his family. Rwandan officials strictly monitor all conversations that the family and consular officials have had with Mr. Rusesabagina—making it patently clear that he is unable to speak freely.

151.   Mr. Rusesabagina, a cancer survivor who also suffers from heart disease and hypertension, requested—and was denied—bail on two occasions, citing poor health.[145]   He is currently confined to a prison where Covid runs rampant.  As a 66-year-old male with multiple co-morbidities, Mr. Rusesabagina is at extremely high risk of contracting the potentially deadly disease.

152.   Despite being in custody for over three months, Mr. Rusesabagina was only recently allowed access to lawyers other than those effectively "chosen" by the government. The Rwandan Bar Association has been conspicuously unavailable to give the required approval to all of Mr. Rusesabagina's chosen counsel. The family's criticisms of the Rwandan "sham" trial are falling upon deaf ears: "Rusesabagina is a Belgian citizen who was kidnapped and brought to Rwanda illegally. Before anything else happens in his trial, he should be allowed to

---

[145] Ignatius Ssuuna, "Prosecutor says 'Hotel Rwanda' Man to be Tried with Rebels," available at: https://apnews.com/article/trials-paul-rusesabagina-rwanda-archive-kigali-3864642832c904f54d949b6771a6b2a8 (last accessed October 10, 2020).

talk to his independent lawyers that have been hired for him, not the lawyers the government has enforced on him."[146]

153.   Mr. Rusesabagina was not brought in front of a Judge until 14 September 2020, eighteen days after his arrest. It was not until December that the Rwandan government indicted Mr. Rusesabagina, charging him with 9 offenses related to alleged "terrorism."[147]   Mr. Rusesabagina is not guilty of those or any other crimes, and he has so pleaded. He is instead a high-profile and effective critic of Kagame and his regime, and is the latest in a long and tragic line of Kagame victims.

154.   On 17 September 2020, the court denied Mr. Rusesabagina's government-sponsored lawyers' request for provisional release.[148]

155.   On 2 October 2020, the Nyarugenge intermediate court denied Mr. Rusesabagina's appeal of this decision, and he remains in Mageragere Prison.

156.   Despite Mr. Rusesabagina's strong opposition, on October 5, 2020, the Rwandan prosecutors announced that the government intended to force him to

---

[146] *Id.*

[147] Rwanda: Organic Law No. 01/2012/OL instituting the Penal Code, 2 May 2012, Arts. 140, 459, 498.

[148] "Paul Rusesabagina of Hotel Rwanda film denied bail", Al Jazeera, 17 September 2020 ("17 September Al Jazeera Article"), available at <https://www.aljazeera.com/news/2020/09/paul-rusesabagina-hotelrwanda-film-denied-bail-200917150653834.html> (last accessed 6 October 2020).

stand trial with 16 alleged "rebel fighters," and two leaders of the FLN group, Calixte Nsabimana (aka Sankara) and Herman Nsengimana.[149]

157.   It was not until November 17, 2020, nearly three months after abducting Mr. Rusesabagina, that the Rwandan government released the indictment detailing the charges against him.

## CLAIMS FOR RELIEF

### COUNT 1
### Violation of the Torture Victim Protection Act
### (*Against Constantin Niyomwungere*)

158.   Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

159.   The TVPA was adopted to create a civil cause of action to ensure "[j]udicial protection against [specified] flagrant human rights violations targeting foreign citizens in foreign lands in recognition of the "universal condemnation" of official torture. The TVPA is therefore "designed to respond to this situation by providing a civil cause of action in U.S. courts for torture committed abroad." *See* S. Rep. No. 102-249, at 3-4 (1991). *See also* H.R. Rep. No. 102-367(I), at 3 (1991).

---

[149] *Id.*

74

160.   Constantin Niyomwungere, acting as an agent of the Rwandan government, contacted Mr. Rusesabagina at his home in San Antonio, Texas to lure him out of the United States so that the coconspirators could unlawfully abduct and rendition him to Rwanda.

161.   To this end, Niyomwungere and his coconspirators fabricated a story that Mr. Rusesabagina had been invited to an important meeting with prominent church leaders in Burundi. The coconspirators' objective was to get Mr. Rusesabagina to leave the United States under false and fraudulent pretenses and eventually board the GainJet aircraft. Their plan, which they successfully carried out, was to  ultimately kidnap torture, and falsely imprison him.

162.   The defendants and their coconspirators tortured Mr. Rusesabagina. He endured severe pain and suffering, both physical and mental, by being abducted, then bound and blindfolded continuously for three consecutive days, and then consequently subjected to cruel and degrading imprisonment in Rwanda.

163.   Defendants Niyomwungere set in motion the chain of events that led to Mr. Rusesabagina's kidnapping in the UAE and his torture aboard the GainJet aircraft and in Rwanda. Defendants' actions were also purposefully aimed at the United States, as Mr. Rusesabagina was a U.S.-resident activist and human rights

advocate. Defendants abducted and imprisoned him to silence his political activities in the United States and Rwanda.

164.   Defendant Niyomwungere's acts were committed under actual or apparent authority, or color of law, of the government of Rwanda, and constitute torture under the TVPA.

165.   As a result of the acts of Defendant Niyomwungere, Mr. Rusesabagina sustained pain and suffering and bodily injuries.

166.   As a result of the acts of Defendant Niyomwungere, Mr. Rusesabagina suffered deprivation of liberty and emotional pain and suffering.

167.   The aforesaid acts of Defendant Niyomwungere constitute violations of the treaties of the United States and the law of nations.

## COUNT 2
### Violation of the Alien Tort Statute: Forced Disappearance
### (*Against Constantin Niyomwungere*)

168.   Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

169.   The ATS was enacted so that U.S. courts would have jurisdiction over actions in tort that violate the law of nations, even when committed against non-U.S.-citizens, so that victims of such wanton conduct would have a civil remedy.

170.   The abduction, extraordinary rendition, and forced disappearance of Mr. Rusesabagina constitutes a "tort . . . committed in violation of the law of nations or a treaty of the United States" under the Alien Tort Statute, 28 U.S.C. § 1350, in that it violated customary international law prohibiting extraordinary rendition and persecution as reflected, expressed, defined, and codified in customary international law, multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

171.   The exercise of subject matter jurisdiction over this claim pursuant to the Alien Tort Statute is proper because the claim touches and concerns the United States. As detailed above, significant portions of the conduct that is the subject of this complaint occurred inside the United States. For example, Defendant Niyomwungere, acting as an agent of the Rwandan government, contacted Mr. Rusesabagina at his home in San Antonio, Texas to lure him out of the country to be kidnapped.

172. Pursuant to Rwanda's extraordinary scheme, Defendant Niyomwungere and the other coconspirators subjected Mr. Rusesabagina to forced disappearance. International law prohibits the arrest, detention, abduction, or any other form of deprivation of liberty by agents of the State or by persons or groups of persons acting with the authorization, support, or acquiescence of the State, and

the subsequent refusal to acknowledge the deprivation of liberty or concealment of the fate or whereabouts of the disappeared person. Rwanda's entire extraordinary rendition scheme is premised on the secret detention of suspects without any official acknowledgement of the location or fact of their detention. The program has the effect of placing individuals beyond the reach of legal protections, thereby rendering them particularly vulnerable to torture and other illegal methods of detention and interrogation. The prohibition against forced disappearance is a "specific, universal, and obligatory" norm of customary international law cognizable under the ATS..

173.   Defendant Niyomwungere actively participated in numerous aspects of the logistical planning and implementation of the extraordinary rendition of Mr. Rusesabagina, with actual or constructive knowledge that his involvement would result in the secret apprehension and detention of Mr. Rusesabagina.

174.   In the alternative, Defendant Niyomwungere is liable for the violation of Mr. Rusesabagina's rights because he conspired with and/or aided and abetted agents of the Rwandan government in Mr. Rusesabagina's forced disappearance. Defendant Niyomwungere entered into an agreement with agents of the Rwandan government to unlawfully render Mr. Rusesabagina to secret detention aboard the GainJet aircraft and in Rwanda. Defendant Niyomwungere participated in or

committed a wrongful act in furtherance of the conspiracy, which resulted in injury to Plaintiffs.

175.   As a result of the acts of Defendant Niyomwungere and his coconspirators, Mr. Rusesabagina sustained pain and suffering and bodily injuries.

176.   As a result of the acts of Defendant Niyomwungere and his coconspirators, Mr. Rusesabagina suffered deprivation of liberty and emotional pain and suffering.

177.   Defendant Niyomwungere's acts constitute violations of the treaties of the United States and the law of nations.

178.   Additionally, Mr. Rusesabagina is entitled to a declaratory judgment stating that Defendant Niyomwungere has violated the law of nations by abducting Mr. Rusesabagina.

## COUNT 3
### Violation of the Alien Tort Statute: Torture and Other Cruel, Inhuman, or Degrading Treatment (*Against Constantin Niyomwungere*)

179.   Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

180.   Defendant Niyomwungere and his coconspirators subjected Mr. Rusesabagina to torture and other cruel, inhuman, or degrading treatment.

79

Customary international law prohibits any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. This norm incorporates, among other things, the prohibition against removing any person, regardless of status, to a country where there is a substantial likelihood that he will be tortured. The prohibition against torture and other cruel, inhuman, or degrading treatment is a "specific, universal, and obligatory" norm of customary international law cognizable under the ATS.

181.   Defendant Niyomwungere and his coconspirators subjected Mr. Rusesabagina to torture and other cruel, inhuman, or degrading treatment during his transportation to Rwanda; as a consequence of his rendition to Rwanda; and while detained and interrogated there.

182.   Defendant Niyomwungere is liable for the violation of Plaintiffs' rights because he conspired with and/or aided and abbeted agents of Rwanda in

Mr. Rusesabagina's torture and other cruel, inhumane, or degrading treatment, including his rendition to Rwanda, when he knew or reasonably should have known that there was a substantial likelihood that Mr. Rusesabagina would be subjected to torture and other forms of cruel, inhuman, or degrading treatment there.

183.   Through his commission of the above-detailed acts, Defendant Niyomwungere participated in or committed a wrongful act in furtherance of the conspiracy, which resulted in injury to Plaintiffs.

## COUNT 4

### Civil Conspiracy
### (*Against Constantin Niyomwungere and GainJet*)

184.   Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

185.   Defendants Niyomwungere and GainJet and other coconspirators met with each other for the purpose of unlawfully kidnapping Mr. Rusesabagina, transporting him to Rwanda, torturing him, and unlawfully detaining him in Rwanda. To effectuate the conspiracy, the coconspirators paid GainJet to intentionally misrepresent its flight destination, surreptitiously fly Mr.

Rusesabagina to Rwanda, and covertly coordinate with Rwandan officials for Mr. Rusesabagina to be wrongfully detained upon arrival.

186.   As part of the conspiracy, agents of the Rwandan government surveilled Mr. Rusesabagina in Texas and, through Defendant Niyomwungere, made contact with him under false pretenses. Defendants and other coconspirators fabricated the existence of an important meeting with prominent church leaders, so as to entice Mr. Rusesabagina to travel to Dubai and, they falsely led him to believe, on to Burundi. Defendants, in conspiracy with coconspirators, arranged for Mr. Rusesabagina to fly via charter jet to Rwanda after Mr. Rusesabagina arrived at his layover in Dubai.

187.   Defendants and the other coconspirators intentionally misled Mr. Rusesabagina by providing him a false itinerary, causing him to believe he would be traveling to Burundi. Once Mr. Rusesabagina arrived in Dubai, Defendants and the other coconspirators continued to conceal and misrepresent Mr. Rusesabagina's final destination. Defendants and the other coconspirators concealed and affirmatively made false and misleading representations to Mr. Rusesabagina about their plan to abduct him and render him to Rwanda, with knowledge of the falsity and with the intention that Mr. Rusesabagina would rely and act upon the misrepresentations. Defendants and the other coconspirators knew that Mr.

82

Rusesabagina would not voluntarily enter Rwanda, and Defendants and the other coconspirators knew that Mr. Rusesabagina was expecting to go to Burundi. Mr. Rusesabagina's reliance on the coconspirators' misrepresentations were reasonable.

188.   Defendants, acting in concert with the other coconspirators, and with intent to commit civil conspiracy, by and through its directors, officers, employees and agents, willfully conspired to defraud, kidnap, abduct, torture, and unlawfully render Mr. Rusesabagina to Rwanda.

189.   As a direct and proximate result of the conspiracy, Plaintiffs have suffered injuries, including bodily harm, loss of freedom, unnecessary expenses, and severe emotional distress and mental anguish.

## COUNT 5
### Fraud  (*Against Constantin Niyomwungere and GainJet*)

190.   Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

191.   Defendants made false and misleading representations to Mr. Rusesabagina, with the knowledge of their falsity or with reckless disregard to the truth, with the intention that Mr. Rusesabagina would rely and act upon those misrepresentations, and he did so, to his detriment.

192.   Defendants further concealed or failed to disclose material facts within their knowledge, of which Defendants knew that Mr. Rusesabagina lacked knowledge, and of which he did not have equal opportunity to discover the truth.

193.   As a proximate cause of such fraudulent representations, Plaintiffs have sustained the damages noted above.

## COUNT 6
### False Imprisonment (*Against Constantin Niyomwungere and GainJet*)

194.   Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

195.   Defendants Niyomwungere and GainJet, acting through its directors, officers, employees and agents, and contract services, willfully detained Mr. Rusesabagina and coordinated with Rwandan authorities to ensure he would be unlawfully abducted in Dubai and unlawfully transported to Rwanda.

196.   Defendants detained Mr. Rusesabagina without his consent.

197.   The kidnapping, abduction, detention, and transportation of Mr. Rusesabagina by Defendants was wrongful and without legal authority or justification.

198.   As a proximate cause of Defendants' unlawful conduct, Plaintiffs have sustained the damages noted above.

## COUNT 7
### Intentional Infliction of Severe Emotional Distress
### (*Against Constantin Niyomwungere and GainJet*)

199.   Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

200.   Defendants and their coconspirators engaged in conduct and made statements which caused plaintiffs severe mental distress and aguish.

201.   Defendants and their coconspirators took such actions and made such statements intentionally in order to cause plaintiffs emotional distress and aguish, or alternatively, were made recklessly and with an entire want of care.

202.   As a direct and proximate result of Defendants' actions and statements, plaintiffs have endured shame, embarrassment, humiliation, and mental anguish.

203.   Defendants' intentional infliction of emotional distress upon plaintiffs was done intentionally, with an entire want of care, and with conscious indifference to the plaintiffs' rights and welfare.

## COUNT 8
### Violations of International Law
### (*Against Constantin Niyomwungere and GainJet*)

85

204.   Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

205.   Rwanda is a party to the International Covenant on Civil and Political Rights. Defendants' kidnapping, abduction, detention, unlawful rendition, and torture of Mr. Rusesabagina, in conspiracy with the government of Rwanda, violated numerous provisions of applicable international law. Among other applicable international law, that conduct violated:

   a.  Article   9 ICCPR, which guarantees Mr. Rusesabagina's right to security of his person and to be free from arbitrary detention and deprivation of his liberty.

   b.  Articles 2, 12, and 13 of ICCPR, which guarantee Mr. Rusesabagina's right to challenge his detention before being rendered to Rwanda from the United States and from the United Arab Emirates;

   c.  Articles 6 and 7 of ICCPR, article 3 of the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment,[150] and customary international law, which guarantee Mr. Rusesabagina's right to be free from torture;

---

[150] Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *openedfor signature* Feb. 4, 1985, **S.** TREATY Doc. No. 100-20, 1465 U.N.T.S. 85, art. 1(1).

d.  Articles 9 and 14 of ICCPR, which guarantee Mr. Rusesabagina's right to be presumed innocent;

e.  Article 14 of ICCPR, which guarantees Mr. Rusesabagina's right to a fair criminal trial.

## **DAMAGES**

206.  As a direct and proximate result of the Defendants' and their coconspirators' conduct, Plaintiffs have suffered injuries and damages, including but not limited to the following:

a.  Mental anguish in the past;

b.  Mental anguish in the future;

c.  Physical pain in the past;

d.  Physical pain in the future;

e.  Loss of consortium in the past;

f.  Loss of consortium in the future;

g.  Past medical expenses;

h.  Future medical expenses;

i.  Disfigurement in the past;

j.  Disfigurement in the future;

k.  Past economic losses;

l.  Future economic losses;

m. Out-of pocket costs;

n.  Loss of opportunity.

## EXEMPLARY DAMAGES

207.  The above-described conduct of Defendants   was willful and malicious.

208.  Further, Defendant GainJet's conduct was especially heinous for an airline whose priority should be the safety and security of its passengers.  GainJet's actions had no basis in the interests of Mr. Rusesabagina, its passenger, but rather the self-serving financial needs of itself.

209.  As a result, Plaintiffs are entitled to recover exemplary damages to deter such cruel and improper conduct in the future. Defendants' actions caused Plaintiffs suffering of immeasurable dimensions, as well as significant expenses. Accordingly, Plaintiffs request that exemplary damages be awarded against Defendants in a sum sufficient to deter similar future actions by Defendants and those similarly situated.

## CONDITIONS PRECEDENT

210.  Plaintiffs have complied with all jurisdictional prerequisites and conditions precedent to the commencement and prosecution of this lawsuit.

88

## **JURY DEMAND**

211.   Plaintiffs hereby demand a trial by jury of all the issues in this cause.

## **PRAYER FOR RELIEF**

212.   WHEREFORE, Plaintiffs request judgment against Defendants as follows:

(a)   For compensatory damages according to proof;

(b)   For punitive and exemplary damages according to proof;

(c)   For reasonable attorneys' fees and costs of suit, according to proof; and

(d)   For such other and further relief as the court may deem just and proper.

Date:  December 14, 2020

Respectfully submitted,

By*: /s/ Robert C. Hilliard*
Robert C. Hilliard
State Bar No. 09677700
bobh@hmglawfirm.com
**HILLIARD MARTINEZ GONZALES LLP**
719 S. Shoreline Blvd.
Corpus Christi, Texas 78401
Phone: (361) 882-1612
Fax: (361) 882-3015

**hmgservice@hmglawfirm.com\*\***
**\*\*Service at this email address only**

Steve D. Shadowen
PA State Bar No. 41953
steve@hilliardshadowenlaw.com
(*Pro hac vice forthcoming*)
Tina Miranda
State Bar No. 24026139
tmiranda@hilliardshadowenlaw.com
*Pro hac vice forthcoming*
Matthew Weiner
State Bar No. 24111041
matt@hilliardshadowenlaw.com
(*Pro hac vice forthcoming*)
Nicholas W. Shadowen
State Bar No. 24110348
nshadowen@hilliardshadowenlaw.com
**HILLIARD SHADOWEN LLP**
1135 W. 6th Street, Suite 125
Austin, Texas 78703
Phone: (717) 903-1177

Frazar Thomas
PA State Bar No. 325478
(*pro hac vice forthcoming*)
**HILLIARD SHADOWEN LLP**
2 Logan Square, Suite 300
Philadelphia, PA 19103
855-344-3298
fraz@hilliardshadowenlaw.com

**COUNSEL FOR PLAINTIFFS**