## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIODIVISION

| | | |
|---|---|---|
| PAUL RUSESABAGINA *et al.* | § | |
| *Plaintiffs* | § | |
| | § | |
| v. | § | Case No.  SA-20-CA-01422-XR |
| | § | |
| GAINJET AVIATION S.A., | § | |
| *Defendant* | § | |

## ORDER

On this day the Court considered Plaintiffs' Motion to Compel Re-Deposition of Captain Ramsey Shaban Khdair and To Take Additional Depositions pursuant to Federal Rule of Civil Procedure 37 (ECF No. 62), Defendant GainJet Aviation, S.A.'s response (ECF No. 63), Plaintiff's reply (ECF No. 64), and the parties' arguments at the hearing held on August 3, 2022. After careful consideration, the Court issues the following order.

## BACKGROUND

This action arises out of the kidnapping of Paul Rusesabagina in August 2020 by the Rwanda government and its alleged co-conspirator, Defendant GainJet Aviation, S.A. ("GainJet"), a private jet charter operator and management company based in Athens, Greece. Mr. Rusesabagina is a Rwandan humanitarian and activist, known for sheltering refugees during the Rwandan genocide and as a critic of Rwandan President Paul Kagame. ECF No. 22 ¶¶ 1–4. After an assassination attempt in 1996, Mr. Rusesabagina fled from Rwanda to Belgium, where he has citizenship. *Id.* ¶ 98. Until his kidnapping, Mr. Rusesabagina divided his time between Belgium and his home in San Antonio, Texas, as a lawful permanent resident of the United States. *Id.* ¶¶ 20, 100.

In 2020, a man who identified himself as Bishop Constantin Niyomwungere contacted Mr. Rusesabagina at his home in San Antonio, Texas, and invited him to speak at churches in Burundi about the Rwandan genocide and Hotel Rwanda. *Id.* ¶ 124. The visit was intended to be short—from August 26, 2020 to September 2, 2020. *Id.* On August 26, 2020, Mr. Rusesabagina flew from San Antonio to Chicago and then to Dubai, United Arab Emirates, on Emirates Airlines. In Dubai, Mr. Rusesabagina boarded a private jet chartered by GainJet and was allegedly deceived into believing that he was flying to Burundi. Indeed, he alleges that, before takeoff, he chatted with the pilot, Alexandros Karpouzis, and a flight attendant, Louiza Boukla, who both confirmed that their destination was Burundi.[1] *Id.* ¶ 126, 131.

Unbeknownst to Mr. Rusesabagina, he was instead being flown to Kigali, Rwanda—against his will. GainJet had in fact been paid and hired by Rwandan officials to fly Mr. Rusesabagina from Dubai to Kigali, Rwanda, pursuant to an Annual Charter Contract with the Rwandan government. Upon landing in the early hours of August 28, 2020, Mr. Rusesabagina realized that he was at Kigali International Airport. He began to scream and tried to exit the plane, believing that he was going to be killed. Four Rwandan agents then entered the plane, tied his hands and legs, covered his face, and dragged him across the tarmac into a car—all in plain sight of the GainJet flight crew. Karpouzis, the pilot, wished Mr. Rusesabagina "good luck" as he was dragged off the plane. *Id.* ¶ 134.

On the tarmac, Mr. Rusesabagina was surrounded by armed Rwandan law enforcement officers and taken to an unknown location, where, bound and blindfolded, he was detained, interrogated, and physically and psychologically tortured for three days. *Id.* ¶¶ 139–40. After he refused to confess to the terrorism-related crimes for which he was allegedly arrested, Mr.

---

[1] These flight crew members are identified in the Amended Complaint as "Alexandre" and "Alice." *See* ECF No. 22 ¶ 131.

Rusesabagina was transferred to the Remera Police Station for 22 days and then to the Nyarugenge Central Prison, where he was held in solitary confinement for 22.5 hours per day for 260 days and remains to this day. *Id.* ¶ 145.

While in prison at the Nyarugenge facility, Mr. Rusesabagina, who is a cancer survivor and suffers from heart disease and hypertension, has been denied access to adequate medical care. *Id.* ¶¶ 161–62. Rwandan officials have also interfered with Mr. Rusesabagina's access to legal representation and the court system. *Id.* ¶¶ 12–14, 147–68. The Rwandan government failed to release the indictment detailing the charges against Mr. Rusesabagina until nearly three months after his abduction. *Id.* ¶ 168. Despite charging Mr. Rusesabagina with nine offenses related to "terrorism" and announcing that he was the "subject of an International Arrest Warrant" and detained through "international cooperation," the Rwandan government has not produced any evidence that would justify the abduction. *Id.* ¶¶ 147–48, 164.

Mr. Rusesabagina and his wife and children filed this action in December 2020 against Niyomwungere and GainJet, alleging a conspiracy among the Rwandan government, Constantin Niyomwungere, and GainJet to extradite, detain, and torture Mr. Rusesabagina. ECF No. 1. After attempting for nearly a year to serve Niyomwungere with process, Plaintiffs voluntarily dismissed their claims against him and filed an Amended Complaint against GainJet only, asserting claims for civil conspiracy, fraud, false imprisonment, assault and battery, intentional infliction of severe emotional distress, and violations of international law. *See* ECF Nos. 21, 22.

In November 2021, GainJet moved to dismiss Plaintiffs' claims, arguing, *inter alia*, that the Court lacked personal jurisdiction over GainJet. ECF No. 25 at 24–27. Thereafter, Plaintiffs moved for leave to conduct jurisdictional discovery to develop the facts needed to refute the jurisdictional allegations in GainJet's motion to dismiss. ECF No. 30. At a hearing on February

24, 2022, the Court granted Plaintiffs 90 days to conduct limited discovery, including the deposition of a corporate representative to determine whether they could establish specific jurisdiction over GainJet in Texas based on the flights in question, including questions about whether GainJet was aware of the sham invitation, whether GainJet had anything to do with getting Mr. Rusesabagina from San Antonio to Dubai, and what information the Rwandan government gave to GainJet regarding the Dubai charter. ECF No. 52, Hr'g Tr. at 15:7–16:4. In March 2022, Plaintiffs began serving jurisdictional discovery requests on GainJet, including a set of interrogatories, a set of requests for production of documents, and a notice to depose GainJet's designated FED. R. CIV. P. 30(b)(6) witness, Captain Ramsey Shaban Khdair. GainJet timely responded to the discovery requests and produced Khdair for a deposition in Athens on April 15, 2022. *See* ECF No. 62-1, Khdair Dep. at 4:2–6.

In the course of this process, Plaintiffs discovered several pieces of information that, together with the allegations in the Amended Complaint, suggest that GainJet may have been both aware of and a willing participant in the conspiracy to kidnap Mr. Rusesabagina. First, the Rwandan government changed the departure date for the flight several times (through phone calls between John Paul and Fedra Pergialioti) without explanation. Indeed, the GainJet aircraft used in the kidnapping sat on the tarmac in Dubai for nine days waiting for its passengers, purportedly with no passenger information and no explanation from the Rwandan government as to why the aircraft should remain grounded. *See* ECF No. 62-1, Khdair Dep. at 101:24–102:3. Second, GainJet violated its own charter agreement by accepting passenger travel documents mere hours before departure and by failing to issue passenger tickets. The charter agreement requires passenger names to be forwarded to GainJet at least 48 hours in advance of departure in order to provide the information to immigration authorities in a timely manner and requires that passengers

be issued tickets.[2] *Id.* at 37:9–38:25, 39:19–40:17. Fourth, GainJet changed its flight crew without reflecting the change in the flight manifest. *Id.* at 63:13–25. Finally, Khdair could not testify as to whether the Rwandan official who booked the flight, John Paul, was in Texas when he communicated with Ms. Pergialioti because the cell phone she used in their conversation was apparently "damaged" and replaced. *See id.* at 92: 3–7; 15–22.

During the deposition, GainJet's counsel instructed Khdair not to answer several of the questions asked by Plaintiffs' counsel, including:

1. "How do you know that the circumstances [of the kidnapping] are not true, if you didn't interview the individuals on the plane?" *Id.* at 17:9–19:4.

2. "[O]nce you learned that your aircraft and your pilots had been used to abduct Mr. Rusesabagina, what remedial action did you take?" *Id.* at 24:21–25:14.

3. "Based on the facts that you have now and everything that you've heard from the Rwandan government, based on the pleadings that are before you, do you believe that there was some foul play?" *Id.* at 27:16–19.

4. "What did [the flight captain] tell you about the conversations that – or what did any of crew members tell you about the conversations that they had with any of the passengers on the flight that day?" *Id.* at 84:21–87:16.

5. Whether Khdair had reviewed affidavits received on the morning of the deposition – one from Rusesabagina complaining about legal proceedings in Rwanda and the other (in French) from someone named Jean-Felix Rudakemwa about events that occurred during the course of the flight and afterwards. *Id.* at 94:7–99:3.

6. "Did you ask if there was anything placed in any of the food or beverages that were served to Mr. Rusesabagina on the flight?" *Id.* at 99:1–12.

7. "Did you receive any instructions – did GainJet receive any instruction with respect to what food and beverage was to be served to Mr. Rusesabagina, prior to the flight?" *Id.* at 9:13–16.

---

[2] GainJet disputes that either of these actions constitutes a policy violation. Khdair testified that this was "not a binding figure" and noted that they quite often receive passenger information much closer to departure. ECF No. 62-1, Khdair Dep. at 38:20–25. He further explained that GainJet never issues tickets to passengers because the ticketing provision only applies to scheduled route carrier flights, which is not a service that GainJet currently provides. *Id.* at 40:3–41:18.

After the deposition, Plaintiffs served additional discovery requests, to which GainJet timely responded. In May 2022, the Court granted Plaintiffs' unopposed motion to extend jurisdictional discovery until June 24, 2022.

Plaintiffs now seek leave to re-open the deposition of Khdair with respect to GainJet's role in the conspiracy to kidnap Rusesabagina before, during, and after the flight based on defense counsel's instructions to Khdair not to answer these questions. ECF No. 62. They further assert that Khdair was unfit to be designated as a 30(b)(6) witness given his inability to answer certain questions about the lawsuit and flight and his failure to conduct any investigation into the matter. Accordingly, they also seek leave to depose the GainJet pilots and a cabin crew member on Mr. Rusesabagina's flight along with the GainJet ground operations manager, Fedra Pergialioti, who worked with the Rwandan government to book the flight in question. *Id.* at 8. The Court held a hearing on the motion on August 3, 2022. ECF No. 72.

## DISCUSSION

### I.    Legal Standards

#### A.    Jurisdictional Discovery

A district court has "broad discretion in all discovery matters," and "such discretion will not be disturbed ordinarily unless there are unusual circumstances showing a clear abuse." *Kelly v. Syria Shell Petroleum Dev.*, 213 F.3d 841, 855 (5th Cir. 2000). "As the party opposing dismissal and requesting discovery, the plaintiffs bear the burden of demonstrating the necessity of discovery." *Monkton Ins. Servs., Ltd. v. Ritter*, 768 F.3d 429, 434 (5th Cir. 2014) (citing *Davila v. United States*, 713 F.3d 248, 263–64 (5th Cir. 2013)). A plaintiff is not entitled to jurisdictional discovery when "the record shows that the requested discovery is not likely to produce the facts needed to withstand a Rule 12(b)(1) motion." *Freeman v. United States*, 556 F.3d 326, 342 (5th

Cir. 2009). Moreover, "[d]iscovery on matters of personal jurisdiction . . . need not be permitted unless the motion to dismiss raises issues of fact". *Wyatt v. Kaplan*, 686 F.2d 276, 283 (5th Cir. 1982). "When the lack of personal jurisdiction is clear, discovery would serve no purpose and should not be permitted." *Id.*

### B.  Rule 30(b)(6)

Under Federal Rule of Civil Procedure 30(b)(6), in a notice or subpoena a litigant "may name as the deponent a public or private corporation, a partnership, an association, a governmental agency, or other entity and must describe with reasonable particularity the matters for examination. The named organization must then designate one or more officers, directors, or managing agents ...." FED. R. CIV. P. 30(b)(6). The designated persons "must testify about information known or reasonably available to the organization." *Id.*

"[T]he deponent must make a conscientious good-faith endeavor to designate the persons having knowledge of the matters sought by the party noticing the deposition and to prepare those persons in order that they can answer fully, completely, unevasively, the questions posed as to the relevant subject matters." *Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 433 (5th Cir. 2006) (internal alterations and quotation marks omitted) (quoting *Bank of N.Y. v. Meridien BIAO Bank Tanzania Ltd.*, 171 F.R.D. 135, 151 (S.D.N.Y. 1997)). "When a corporation produces an employee pursuant to a rule 30(b)(6) notice, it represents that the employee has the authority to speak on behalf of the corporation with respect to the areas within the notice of deposition." *Id.* These principles bind a party to its corporate representative's answers and prohibit a party from later introducing evidence on a topic where its representative disclaimed knowledge during the deposition. *Super Future Equities, Inc. v. Wells Fargo Bank Minn., N.A.*, No. 3:06-CV-0271-B, 2007 WL 4410370, at *8 (N.D. Tex. Dec. 14, 2007).

The scope of a Rule 30(b)(6) deposition is not limited to the topics listed in the notice. *See Rivas v. Greyhound Lines, Inc.*, EP-14-CV-166-DB, 2015 WL 13710124, at *4 (W.D. Tex. Apr. 27, 2015). While the designated corporate representative is not required to be prepared to answer questions outside the scope of the Rule 30(b)(6) notice, he "cannot use Rule 30(b)(6) as a shield if he or she in fact knows the answers to those questions." *Id.* at *6.

## II.    Analysis

Plaintiffs bear the burden of establishing that the requested discovery is likely to yield facts supporting the Court's exercise of jurisdiction over GainJet in this case. *Freeman*, 556 F.3d at 342. To determine whether the requested discovery is relevant to the jurisdictional issues identified in GainJet's motion to dismiss, then, the Court must examine Plaintiffs' theory of personal jurisdiction. Plaintiffs assert that GainJet's torts began in Texas and continued on the Dubai-to-Rwanda flight. They argue that "GainJet's conduct on the aircraft is the epicenter of the specific jurisdiction analysis" and that they are entitled to know who the GainJet employees spoke to, which employees were involved, and what those employees said about the incident in question. ECF No. 62 at 6. Defendant responds that these questions have no connection to the issue of specific jurisdiction over GainJet in Texas. ECF No. 63. The Court agrees.

Due process requires that a defendant have "minimum contacts" with the forum state and that exercising jurisdiction is consistent with "traditional notions of fair play and substantial justice." *Sangha v. Navig8 ShipManagement Private Ltd.*, 882 F.3d 96, 101 (5th Cir. 2018). "Minimum contacts" can give rise to either specific jurisdiction or general jurisdiction. *Wilson v. Belin*, 20 F.3d 644, 647 (5th Cir. 1994). Specific jurisdiction may exist "over a nonresident defendant whose contacts with the forum state are singular or sporadic only if the cause of action asserted arises out of or is related to those contacts." *Id.* In other words, such jurisdiction exists

8

"when a nonresident defendant has purposefully directed its activities at the forum state and the litigation results from alleged injuries that arise out of or relate to those activities." *Id*. "[S]pecific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Id.*

The Fifth Circuit has established a three-step analysis for determining whether specific jurisdiction exists: "(1) whether the defendant has minimum contacts with the forum state, i.e., whether it purposely directed its activities toward the forum state or purposely availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable." *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 271 (5th Cir. 2006) (quoting *Nuovo Pignone, SpA v. STORMAN ASIA M/V*, 310 F.3d 374, 378 (5th Cir. 2002)). Even where a defendant has no physical presence in the forum state, a single purposeful contact may be sufficient to confer personal jurisdiction if the cause of action arises from the contact. *Nuovo Pignone*, 310 F.3d at 379.

Specific jurisdiction "focuses on the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore*, 571 U.S. 277, 284 (2014). In determining whether a defendant has minimum contacts with a state, courts consider whether the defendant's conduct and connection with the forum state is such that the defendant "should reasonably anticipate being haled into court there." *Burger King v. Rudzewicz,* 471 U.S. 462, 475(1985)). For a court to exercise jurisdiction over a defendant, the relationship between the defendant and forum state "must arise out of contacts that the 'defendant himself' creates with the forum State" and "not the defendant's contacts with persons who reside there." *Walden*, 571 U.S. at 284. In other words, "[d]ue process requires that a defendant be haled into court in a forum State based on his own affiliation with the

State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State." *Id.* at 286 (quoting *Burger King,* 471 U.S. at 475). Accordingly, "[a] forum State's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on intentional conduct by the defendant that creates the necessary contacts with the forum." *Id.*

Plaintiffs argue that discovery as to what occurred on the aircraft is now warranted because GainJet's alleged tortious conduct onboard the flight was "felt in Texas" and, therefore, Texas courts have specific jurisdiction under the *Calder* "effects test." *Calder v. Jones*, 465 U.S. 783, 788–789 (1984). In *Calder*, Shirley Jones, a television entertainer, brought suit in California Superior Court claiming that she had been libeled in an article written and edited by petitioners in Florida. The article was published in the National Enquirer with a large circulation in California. The Court held that the writer and editor of the article were subject to jurisdiction in California because their intentional conduct in Florida was calculated to cause injury to Jones in California: the article was drawn from California sources, and the brunt of the harm, in terms both of respondent's emotional distress and the injury to her professional reputation, was suffered in California. "California is the focal point both of the story and of the harm suffered. Jurisdiction over petitioners is therefore proper in California based on the 'effects' of their Florida conduct in California." *Id.* at 783.

GainJet asserts that *Walden v. Fiore* is more instructive. ECF No. 63 at 7–8 (citing 571 U.S. at 277). There, the respondents sued former DEA agent Anthony Walden in the District of Nevada, where they resided, for violations of their Fourth Amendment rights stemming from a DEA search and seizure conducted at an airport in Atlanta, Georgia. As a result of the search, Walden seized almost $97,000 in cash from the respondents and later helped draft an allegedly

false and misleading affidavit to show probable cause for forfeiture of the funds, which he then forwarded to the U.S. Attorney's Office in Georgia. In the end, no forfeiture complaint was filed, and the DEA eventually returned the cash to respondents in Nevada. Although the effects of Walden's tortious conduct were clearly felt in Nevada—as the respondents awaited federal prosecution and the return of nearly $100,000 in cash—the Supreme Court concluded that Walden lacked minimum contacts with Nevada because he had "never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada." *Id.* at 289. "In short, when viewed through the proper lens—whether the defendant's actions connect him to the forum— [Walden] formed no jurisdictionally relevant contacts with Nevada." *Id.* The Court reasoned that the plaintiff cannot be the only link between the defendant and the forum. *Id.* at 285.

Indeed, a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction. *Rush v. Savchuk*, 444 U.S. 320, 332 (1980). While "the parties' relationships with each other may be significant in evaluating their ties to the forum," the requirements of specific jurisdiction "must be met as to each defendant over whom a state court exercises jurisdiction." *Id.* Thus, it is not enough to allege that a defendant was part of a larger conspiracy directed at a particular resident of a state. *Chow v. United States*, No. 20-30503, 2021 WL 3438365, *2 (5th Cir. Aug. 5, 2021) ("[The plaintiffs] appear to believe that their civil conspiracy claim is enough to establish personal jurisdiction over all of the defendants. There is no authority from this court supporting [this] belief[.]"); *Eagle Metal Prod., LLC v. Keymark Enters., LLC*, 651 F. Supp. 2d 577, 593 (N.D. Tex. 2009) (rejecting application of "conspiracy theory" of jurisdiction based on Fifth Circuit case law, including *Delta Brands, Inc. v. Danieli Corp.*, 99 F. App'x 1, 6 (5th Cir. 2004)); *Hawkins v. Upjohn Co.*, 890 F. Supp. 601, 608 (E.D. Tex. 1994) ("There are numerous problems with plaintiffs' contention that if this court has personal

jurisdiction over one of the conspirators, it can exercise personal jurisdiction over the co-conspirators as well. First, there is no support in the Fifth Circuit, or any other Circuit for that matter, to support this court exercising personal jurisdiction on this theory."); *Fed'n of State Massage Therapy Bds. v. Mendez Master Training Ctr., Inc.*, No. 4:17-CV-2936, 2018 WL 534540, at *5 n.9 (S.D. Tex. Jan. 24, 2018) (collecting cases). Instead, to establish that the court has personal jurisdiction over a particular co-conspirator, the plaintiff must show that the conspiracy was related to or arose out of that co-conspirator's purposeful contacts with the forum state. *WorldVentures Holdings, LLC v. Mavie*, No. 4:18CV393, 2018 WL 6523306, at *10 (E.D. Tex. Dec. 12, 2018) (citing *Delta Brands*, 99 F. App'x at 5); *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 869 (5th Cir. 2001) (holding that the foreseeability of causing injury in Texas is insufficient for specific personal jurisdiction, and that the plaintiff must also show that the defendant purposefully directed its efforts towards the forum state).

As discussed, the Court agrees with Plaintiffs that much of the jurisdictional evidence suggests that GainJet was aware of or agreed to participate in the kidnapping of Mr. Rusesabagina. However, it is not clear to the Court that establishing GainJet's intent to kidnap a resident of Texas in Dubai would establish *purposeful* contacts with the state of Texas. *Panda Brandywine*, 253 F.3d at 869. Even assuming that, as Plaintiffs maintain, Mr. Rusesabagina was injured the moment he was lured from his home in San Antonio, there is no reason to believe that GainJet itself had any role in convincing Mr. Rusesabagina to leave Texas. Indeed, there is no evidence that GainJet ever contacted Mr. Rusesabagina concerning the flight while he was still in San Antonio or had any other contact with Texas in furtherance of the conspiracy.[3] To the extent that GainJet employees

---

[3] There is no guarantee that such contacts, if they existed, would be sufficient to establish specific jurisdiction over GainJet. *See Paolino v. Argyll Equities*, L.L.C., 401 F. Supp. 2d 712, 720 (W.D. Tex. 2005) ("The law is clear that an exchange of communications between a resident and a nonresident in developing a contract is insufficient of itself to be characterized as purposeful activity invoking the benefits and protection of the forum states laws.") (citing

deceived Mr. Rusesabagina, it appears that they misrepresented his destination while he was in Dubai. This misrepresentation does not constitute a contact with Texas, but with a person who resides there. *Walden*, 571 U.S. at 284.

Accordingly, the Court must deny Plaintiffs' motion to compel further jurisdictional discovery because it is premised on this faulty "conspiracy theory" of personal jurisdiction. The questions identified in Plaintiffs' motion bear on GainJet employees' awareness of the conspiracy rather than their purposeful contacts with Texas. *See generally* ECF No. 62. A designated corporate representative is not required to be prepared to answer questions outside the scope of the FED. R. CIV. P. 30(b)(6) notice. *Unitech Energy Tools Ltd. v. Nabors Drilling Tech. USA, Inc.*, 2020 WL 4227467, at *3 (S.D. Tex. July 23, 2020). Captain Khdair answered all questions regarding potential contacts with the State of Texas—communications that GainJet had with Mr. Rusesabagina, Niyomwungere, and the Rwandan government in advance of the flight. Khdair spoke with GainJet's Ground Operations Manager, who was directly involved in the booking of the flight at issue and first received Mr. Rusesabagina's information from the Rwandan government. Although the mobile phone used in communicating with the Rwandan government was damaged, GainJet sought and produced phone records and WhatsApp messages with information sent by the Rwandan government to GainJet and records kept for GainJet accounts involved in the flight's booking. While the Court is sympathetic to Plaintiffs' desire to learn more about the conspiracy generally, such inquiries are beyond the scope of the limited jurisdictional discovery that was authorized.

---

*Stuart v. Spademan*, 772 F.2d 1185, 1193 (5th Cir. 1985)); *Sangha v. Navig8 ShipManagement Priv. Ltd.*, 882 F.3d 96, 103 (5th Cir. 2018) (concluding that email communications concerning work to be performed in Texas under a contract formed in Texas insufficient to exercise jurisdiction over the defendant in Texas, even though the plaintiff was terminated and removed from his employer's vessel in Texas).

**CONCLUSION**

For the foregoing reasons, Plaintiffs' motion to re-open the deposition of Khdair Captain Khdair and to depose additional GainJet employees (ECF No. 62) is **DENIED**.

Plaintiffs' motion for leave to file supplemental briefing (ECF No. 73) in response to Defendant's motion to dismiss is **GRANTED**. Plaintiffs are cautioned, however, that to the extent any such supplemental briefing is premised on the theory that GainJet is subject to personal jurisdiction as member of a conspiracy directed at a Texas resident, it is unlikely to cure the jurisdictional deficiencies in the Amended Complaint. Plaintiffs shall file any such briefing within thirty (30) days of this order or seek an extension of time in which to do so.

It is so **ORDERED**.

**SIGNED** this 29th day of November, 2022.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE