UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| PAUL RUSESABAGINA *et al.* § <br> *Plaintiffs* § <br> § <br> v. § <br> § <br> GAINJET AVIATION S.A., § <br> *Defendant* § | Case No. SA-20-CA-01422-XR |

# ORDER

On this day the Court considered Plaintiffs' Motion to Transfer Venue (ECF No. 84), Defendant GainJet Aviation, S.A.'s response (ECF No. 86), Plaintiff's reply (ECF No. 89), and the parties' arguments at the hearing held on July 11, 2022. After careful consideration, the Court issues the following order.

## BACKGROUND

This action arises out of the kidnapping of Paul Rusesabagina in August 2020 by the Rwandan government and its alleged co-conspirator, Defendant GainJet Aviation, S.A. ("GainJet"), a private jet charter operator and management company based in Athens, Greece. Mr. Rusesabagina is a Rwandan humanitarian and activist, known for sheltering refugees during the Rwandan genocide and as a critic of Rwandan President Paul Kagame. After an assassination attempt in 1996, Mr. Rusesabagina fled from Rwanda to Belgium, where he has citizenship. Until his kidnapping, Mr. Rusesabagina divided his time between Belgium and his home in San Antonio, Texas, as a lawful permanent resident of the United States.

**I.    Factual History**

In 2020, a man who identified himself as Bishop Constantin Niyomwungere contacted Mr. Rusesabagina at his home in San Antonio, Texas, and invited him to speak at churches in Burundi

about the Rwandan genocide and Hotel Rwanda. *Id.* ¶ 124. The visit was intended to be short—from August 26, 2020 to September 2, 2020. *Id.* On August 26, 2020, Mr. Rusesabagina flew from San Antonio to Chicago and then to Dubai, United Arab Emirates, on Emirates Airlines. In Dubai, Mr. Rusesabagina boarded a private jet chartered by GainJet and was allegedly deceived into believing that he was flying to Burundi. Indeed, he alleges that, before takeoff, he chatted with the pilot, Alexandros Karpouzis, and a flight attendant, Louiza Boukla, who both confirmed that their destination was Burundi.[1] *Id.* ¶ 126, 131.

Unbeknownst to Mr. Rusesabagina, he was instead being flown to Kigali, Rwanda—against his will. GainJet had in fact been paid and hired by Rwandan officials to fly Mr. Rusesabagina from Dubai to Kigali, Rwanda, pursuant to an Annual Charter Contract with the Rwandan government. Upon landing in the early hours of August 28, 2020, Mr. Rusesabagina realized that he was at Kigali International Airport. He began to scream and tried to exit the plane, believing that he was going to be killed. Four Rwandan agents then entered the plane, tied his hands and legs, covered his face, and dragged him across the tarmac into a car—all in plain sight of the GainJet flight crew. Karpouzis, the pilot, wished Mr. Rusesabagina "good luck" as he was dragged off the plane. *Id.* ¶ 134.

On the tarmac, Mr. Rusesabagina was surrounded by armed Rwandan law enforcement officers and taken to an unknown location, where, bound and blindfolded, he was detained, interrogated, and physically and psychologically tortured for three days. *Id.* ¶¶ 139–40. After he refused to confess to the terrorism-related crimes for which he was allegedly arrested, Mr. Rusesabagina was held in Nyarugenge Central Prison, where he remained for approximately two-and-a-half years before his eventual release and return to the United States in March 2023.

---

[1] These flight crew members are identified in the Amended Complaint as "Alexandre" and "Alice." *See* ECF No. 22 ¶ 131.

## II.     Procedural History

Mr. Rusesabagina and his wife and children filed this action in December 2020 against Niyomwungere and GainJet, alleging a conspiracy among the Rwandan government, Constantin Niyomwungere, and GainJet to extradite, detain, and torture Mr. Rusesabagina. ECF No. 1. After attempting for nearly a year to serve Niyomwungere with process, Plaintiffs voluntarily dismissed their claims against him and filed an Amended Complaint against GainJet only, asserting claims for civil conspiracy, fraud, false imprisonment, assault and battery, intentional infliction of severe emotional distress, and violations of international law. *See* ECF Nos. 21, 22.

In November 2021, GainJet moved to dismiss Plaintiffs' claims, arguing, *inter alia*, that the Court lacked personal jurisdiction over GainJet. ECF No. 25 at 24–27. Thereafter, Plaintiffs moved for leave to conduct jurisdictional discovery to develop the facts needed to refute the jurisdictional allegations in GainJet's motion to dismiss. ECF No. 30. At a hearing on February 24, 2022, the Court granted Plaintiffs 90 days to conduct limited discovery, including the deposition of a corporate representative to determine whether they could establish specific jurisdiction over GainJet in Texas based on the flights in question, including questions about whether GainJet was aware of the sham invitation, whether GainJet had anything to do with getting Mr. Rusesabagina from San Antonio to Dubai, and what information the Rwandan government gave to GainJet regarding the Dubai charter. ECF No. 52, Hr'g Tr. at 15:7–16:4. In March 2022, Plaintiffs began serving jurisdictional discovery requests on GainJet, including a set of interrogatories, a set of requests for production of documents, and a notice to depose GainJet's designated FED. R. CIV. P. 30(b)(6) witness, Captain Ramsey Shaban Khdair. GainJet timely responded to the discovery requests and produced Khdair for a deposition in Athens on April 15, 2022. *See* ECF No. 62-1, Khdair Dep. at 4:2–6.

In the course of discovery, Plaintiffs uncovered several pieces of information that, together with the allegations in the Amended Complaint, suggest that GainJet may have been both aware of and a willing participant in the conspiracy to kidnap Mr. Rusesabagina. First, the Rwandan government changed the departure date for the flight several times (through phone calls between John Paul and Fedra Pergialioti) without explanation. Indeed, the GainJet aircraft used in the kidnapping sat on the tarmac in Dubai for nine days waiting for its passengers, purportedly with no passenger information and no explanation from the Rwandan government as to why the aircraft should remain grounded. *See* ECF No. 62-1, Khdair Dep. at 101:24–102:3. Second, GainJet violated its own charter agreement by accepting passenger travel documents mere hours before departure and by failing to issue passenger tickets.[2] *Id.* at 37:9–38:25, 39:19–40:17. Third, GainJet changed its flight crew without reflecting the change in the flight manifest. *Id.* at 63:13–25. Finally, Khdair could not testify as to whether the Rwandan official who booked the flight, John Paul, was in Texas when he communicated with Ms. Pergialioti because the cell phone she used in their conversation was apparently "damaged" and replaced. *See id.* at 92:3–7; 15–22.

Following this discovery, Plaintiffs moved for leave to re-open Khdair's deposition as to GainJet's role in the conspiracy to kidnap Rusesabagina before, during, and after the flight based on defense counsel's instructions to Khdair not to answer these questions. ECF No. 62. In November 2022, the Court entered an order denying the motion, because Plaintiffs' proposed questions were directed to GainJet employees' awareness of the conspiracy to kidnap Mr. Rusesabagina rather than any purposeful contacts with the state of Texas. *Rusesabagina v. GainJet Aviation S.A.*, No. SA-20-CA-01422-XR, 2022 WL 17331272, at *6 (W.D. Tex. Nov. 29, 2022).

---

[2] The charter agreement requires passenger names to be forwarded to GainJet at least 48 hours in advance of departure in order to provide the information to immigration authorities in a timely manner and requires that passengers be issued tickets. GainJet disputes that either of these actions constitutes a policy violation. ECF No. 62-1, Khdair Dep. at 38:20–25, 40:3–41:18.

4

The Fifth Circuit, however, does not recognize a "conspiracy theory" of personal jurisdiction. *Delta Brands, Inc. v. Danieli Corp.*, 99 F. App'x 1, 6 (5th Cir. 2004). Rather, to establish that the court has personal jurisdiction over a particular co-conspirator, the plaintiff must show that the conspiracy was related to or arose out of that co-conspirator's purposeful contacts with the forum state. *See Rusesabagina*, 2022 WL 17331272, at *6 (collecting cases). Accordingly, Plaintiffs' proposed questions for GainJet about the conspiracy more broadly were beyond the scope of limited jurisdictional discovery that was authorized. *Id.*

**III.    Parallel Litigation against Rwandan Officials in the District of Columbia**

During the pendency of this litigation, Plaintiffs, through other counsel, filed a parallel lawsuit relating to the kidnapping against the Republic of Rwanda, President Kagame, and three Rwandan officials in the U.S. District Court for the District of Columbia (the "D.D.C."). *Rusesabagina v. Republic of Rwanda et al.*, No. 22-469 (RJL), ECF No. 1 (D.D.C. Feb. 22, 2022) (the "D.D.C. Action"). In that case, Plaintiffs asserted numerous claims for intentional torts under Texas common law and for violations of various federal laws, including the Electronic Communications Privacy Act, the Torture Victim Protection Act, and the Alien Tort Statute. *See id.* In January 2023, Judge Richard Leon entered an order dismissing Plaintiffs' claims against Rwanda and Kagame as barred by the doctrines of sovereign immunity and head-of-state immunity, respectively. *Rusesabagina v. Republic of Rwanda*, No. 22-469 (RJL), 2023 WL 355951, at *6 (D.D.C. Jan. 23, 2023).

On March 16, 2023, Judge Leon issued an order granting in part and denying in part a motion to dismiss filed by the three remaining Defendants. *Rusesabagina v. Republic of Rwanda*, No. 22-469 (RJL), 2023 WL 2562692, at *12 (D.D.C. Mar. 16, 2023). Judge Leon found that Plaintiffs had failed to establish specific jurisdiction over the Rwandan officials in the District of

Columbia because Plaintiffs had not pled specific acts within the District of Columbia. *Id.* at *6. Nonetheless, Judge Leon concluded that certain Rwandan officials were subject to the court's jurisdiction under Rule 4(k)(2), which, as discussed below, "is essentially a federal long-arm statute." *Id.* at *7 (citing *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 223 (D.C. Cir. 2022)). Rule 4(k)(2) allows a federal court to exercise personal jurisdiction over a defendant for claims arising under federal law where the defendant is not subject to the jurisdiction of any single state and the exercise of jurisdiction is consistent with the U.S. Constitution. Judge Leon held that the officials' illegal monitoring of Mr. Rusesabagina in the United States coupled with the fraudulent statements relating to a proposed Burundi trip were "sufficient minimum contacts" and that the exercise of personal jurisdiction would be consistent with norms of "fair play and substantial justice." *Id.* at *8.

The Rwandan Officials filed a notice of interlocutory appeal to the D.C. Circuit Court on March 30, 2023. D.D.C. Action, ECF No. 46. The next day, Plaintiffs stipulated to the dismissal of the lawsuit pending in the D.D.C. in exchange for Mr. Rusesabagina's safe return to San Antonio. ECF No. 48. That case is now closed. Nonetheless, Plaintiffs now ask the Court to transfer this action to the D.D.C., asserting that transfer is warranted because the D.D.C. is already familiar with the relevant factual and legal issues and has asserted personal jurisdiction over some of the coconspirators involved in the kidnapping, who may serve as witnesses in this case. ECF No. 84.

## DISCUSSION

**I.  Legal Standard**

Pursuant to 28 U.S.C. § 1404(a): "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division

where it might have been brought." After determining that the suit could have been filed in the destination venue, the Court weighs the parties' private interests in convenience and the public interest in the fair administration of justice. *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947).

The private interest factors are: "(1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive." *In re Volkswagen AG* ("*Volkswagen I*"), 371 F.3d 201, 203 (5th Cir. 2004). The public interest factors include "(1) the administrative difficulties caused by court congestion; (2) the local interest in adjudicating local disputes; (3) the unfairness of burdening citizens in an unrelated forum with jury duty; and (4) the avoidance of unnecessary problems in conflict of laws." *Id.* However, none of these factors are given dispositive weight. *Id.*

The burden of showing "good cause" rests with the movant under 28 U.S.C. § 1404(a), requiring him to persuade the court "that the transferee venue is clearly more convenient." *In re Volkswagen of Am., Inc.* ("*Volkswagen II*"), 545 F.3d 304, 314 (5th Cir. 2008). However, the burden is easier to satisfy than that for forum non conveniens, and a district court has broader discretion in ordering transfer under § 1404(a). *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 253 (1981). This is because, unlike forum non conveniens, a change of venue maintains the same federal forum, so a movant's burden of showing "good cause" is already enough to protect the plaintiff's choice of venue. *Volkswagen II*, 545 F.3d at 314–15.

## II. Analysis

Plaintiffs assert that transfer to the D.D.C. is warranted because "essential witness have already been subjected to the jurisdiction of that court—and it would be otherwise difficult to effectuate service of subpoenas on upon these witnesses." ECF No. 84 at 2. In short, Plaintiffs

7

assert that "[i]t makes practical and logical sense to transfer this matter to a court that has previously considered and decided substantive issues of this case and determined that it had power to exercise jurisdiction over coconspirators who participated in Mr. Rusesabagina's abduction." ECF No. 89 at 3. For the reasons set forth herein, the Court disagrees.

To begin, the Court is not convinced that the D.D.C. would reach the same conclusion as to its personal jurisdiction over GainJet pursuant to Rule 4(k)(2) that it did when considering its jurisdiction over the Rwandan officials. Rule 4(k)(2) was introduced to "close[ ] a loophole that existed prior to the 1993 amendments," by which "a non-resident defendant who did not have 'minimum contacts' with any individual state sufficient to support exercise of jurisdiction, but did have sufficient contacts with the United States as a whole, could escape jurisdiction in all fifty states." *Touchcom, Inc. v. Bereskin & Parr*, 574 F.3d 1403, 1414 (Fed. Cir. 2009). The rule provides:

> If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service is also effective, with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state.

FED. R. CIV. P. 4(k)(2). The rule permits a federal court to establish personal jurisdiction over a foreign defendant for (1) claims arising under federal law, (2) where a summons has been served, (3) if the defendant is not subject to the jurisdiction of any single state court, (4) provided that the exercise of federal jurisdiction is consistent with the Constitution (and laws) of the United States. *Mwani v. Bin Laden*, 417 F.3d 1, 8 (D.C. Cir. 2005)). "'Whether the exercise of jurisdiction is 'consistent with the Constitution' for purposes of Rule 4(k)(2) depends on whether a defendant has sufficient contacts with the United States as a whole to justify the exercise of personal jurisdiction under the Due Process Clause of the Fifth Amendment." *Id.* That, in turn, requires a

court find "(1) minimum contacts demonstrating that the defendant purposefully availed itself of the forum; (2) relatedness between the contacts and the claim; and (3) compliance with "fair play and substantial justice." *Atchley*, 22 F.4th at 233.

In considering whether the exercise of jurisdiction would be consistent with the Constitution, the D.D.C. considered the Rwandan Official's contact with and conduct directed toward the United States:

> Plaintiffs allege that two critical elements of the scheme were carried out while Rusesabagina. . . was physically present in the United States. First, plaintiffs allege that agents of the Rwandan government illegally surveilled Rusesabagina and his daughter while in the United States using spyware illegally planted on their telephones. No later than 2018, Rwandan intelligence agents acting in furtherance of the conspiracy allegedly infected Rusesabagina's Belgian cell phone with Pegasus, a form of spyware, while he was in Belgium. Rusesabagina continued to use that cell phone when he returned to the United States to communicate by voice and text message.
>
> Second, plaintiffs allege that a Rwandan bishop named Constantin Niyomungere ("Niyomwungere"), acting in furtherance of the conspiracy and at the direction of the Officials, fraudulently induced Rusesabagina to travel from the United States to Burundi via the United Arab Emirates in August 2020. Specifically, Niyomwungere invited Rusesabagina to travel to Burundi to speak to church groups and civil society leaders about his experiences during the 1994 Rwandan genocide.

*Rusesabagina*, 2023 WL 2562692, at *1 (citations omitted).

While the Court agrees with Plaintiffs that much of the jurisdictional evidence suggests that GainJet was aware of or agreed to participate in the kidnapping of Mr. Rusesabagina, GainJet's intent to kidnap a resident of the United States does not establish *purposeful* contacts with the United States as a whole. *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 869 (5th Cir. 2001). Even assuming that, as Plaintiffs maintain, Mr. Rusesabagina was injured the moment he was lured from his home in San Antonio, there is no reason to believe that GainJet itself had any role in convincing Mr. Rusesabagina to leave the United States. Indeed, there is no evidence that GainJet ever contacted Mr. Rusesabagina concerning the flight while he was still in

the United States or had any other contact with the United States in furtherance of the conspiracy. To the extent that GainJet employees deceived Mr. Rusesabagina, it appears that they misrepresented his destination while he was in Dubai. Unlike the Rwandan officials' international surveillance of Mr. Rusesabagina while he was in the United States, GainJet's misrepresentation to Mr. Rusesabagina in Dubai does not constitute a contact with the United States. *Walden v. Fiore*, 571 U.S. 277, 284 (2014). This is insufficient to establish a purposeful contact with the United States.

At the hearing held on July 11, 2023, Plaintiffs pointed out that the D.D.C.'s ruling on personal jurisdiction relied in part on allegations that various Rwandan officials participated in the broader conspiracy to surveil and kidnap Rusesabagina, even though their conduct did not involve any contacts with the United States.[3] As discussed in the Court's order denying Plaintiffs' motion to re-open the deposition of Captain Khdair, however, the Fifth Circuit does not recognize a "conspiracy theory" of personal jurisdiction. *See Rusesabagina*, 2022 WL 17331272, at *6 (collecting cases). It is not enough to allege that a defendant was part of a larger conspiracy directed at a particular resident of a state. It is equally insufficient, in the Fifth Circuit, to allege that a defendant was part of a larger conspiracy directed at a particular resident of the United States.

Moreover, as the Fifth Circuit recently clarified in *Douglass v. Nippon Yusen Kabushiki Kaisha*, Rule 4(k)(2) does not expand the constitutional basis for the exercise of personal jurisdiction; it is merely a procedural rule governing the territorial limits of service. 46 F.4th 226

---

[3] *See Rusesabagina*, 2023 WL 2562692, at *2 ("General Joseph Nzabamwita, the head of Rwanda's National Intelligence and Security Services, allegedly admitted that he 'executed' the plot to kidnap Rusesabagina 'from the planning to the full execution, when he landed in Kigali.' Similarly, Johnston Busingye, the former Minister of Justice, allegedly admitted his involvement in the plan to pay for the private aircraft used to kidnap Rusesabagina. And Colonel Jeannot Ruhunga both heads the RIB, which allegedly planned and executed the scheme, and was personally involved in its oversight.").

(5th Cir. 2022). It does not and cannot affect the due process analysis.[4] *Id.* at 233. "[A] foreign corporation's contacts satisfy Fifth Amendment due process only in cases where the parties' dispute arose out of or related to *its contacts with United States* contacts, that is, where specific jurisdiction exists. The Fifth Circuit has never found that a foreign corporation's contacts with the United States alone supported general jurisdiction over unrelated lawsuits." *Id.* at 238 (citations omitted) (emphasis added); *see also id.* at 235 ("If personal injury claims caused in foreign waters by a foreign logistics company's chartered, foreign-registered vessel bound for a foreign country are sufficiently related to that corporation's shipping-related contacts with the United States, then what isn't?"). Transferring this case to the D.D.C. based on its more expansive view of personal jurisdiction would permit the very kind of post-filing forum shopping § 1404 was intended to prevent. *Ferens v. John Deere Co.*, 494 U.S. 516, 527 (1990) ("The . . . policy against forum shopping simply requires us to interpret § 1404(a) in a way that does not create an opportunity for obtaining a more favorable law by selecting a forum through a transfer of venue.").

Even assuming that Rule 4(k)(2) could justify exercising personal jurisdiction over GainJet, there would be no reason to transfer the case to the D.D.C. The exercise of personal jurisdiction under Rule 4(k)(2) is not limited to courts sitting in the District of Columbia. If the D.D.C. Action were still open, it would arguably serve the interest of judicial economy to transfer this case for consolidation under the D.D.C. Action. As it is, however, this Court is equally capable

---

[4] The *Douglass* plaintiffs relied on language from the Fifth Circuit's decision in *Adams v. Unione Mediterranea di Scurta*, stating that, "so long as a defendant does not concede to jurisdiction in another state, a court may use 4(k)(2) to confer jurisdiction." 364 F.3d 646 (5th Cir. 2004). In *Douglass*, however, the Fifth Circuit clarified that *Adams* should not be read to expand the constitutional limits on the exercise of personal jurisdiction because *Adams* represented a straightforward application of *International Shoe*'s specific jurisdiction principles insofar as the plaintiff's claims stemmed from a cargo insurance policy covering a shipment *to the United States*. *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 317 (1945) (jurisdiction over a corporate defendant is proper "when the activities of the corporation [in the forum] have not only been continuous and systematic, but also give rise to the liabilities sued on" (emphasis added)). Thus, the Fifth Circuit determined that the defendant, an Italian insurer, had "continuous and systematic contacts with the United States as a whole." *Id.* at 651–52.

of evaluating personal jurisdiction over GainJet, which would be based on different evidence than the D.D.C. considered in evaluating its jurisdiction over the Rwandan officials. Moreover, regardless of whether this action proceeds in the D.D.C. or this District, the relevant District Court would need to issue a subpoena under 28 U.S.C. § 1783 to secure the appearance of the Rwandan officials as witnesses in this case.

Plaintiffs' motion makes some cursory references to the convenience of litigating this action in the D.D.C. for several Plaintiffs, who reside in or regularly travel to the District of Columbia, and for Defense counsel, who lives in New York, "which is substantially closer to Washington D.C. than this venue." ECF No. 84 at 4. As GainJet points out, however, these arguments lack the requisite specificity to support an argument that the D.D.C. is more convenient. *See* ECF No. 86 at 8–9 (citing *McGinnis v. Eli Lilly & Co.*, 181 F. Supp. 2d 684, 688 (S.D. Tex. 2002) ("At an absolute minimum, [the movant] must identify key witnesses and provide a brief summary of their likely testimony in an effort to demonstrate to the Court why it would be inconvenient for them to testify in [the forum]. Without a realistic and comprehensive summary of the testimony, it is impossible for the Court to determine if a witness' appearance is cumulative or unnecessary for trial.")). Plaintiffs fail to identify any of these Plaintiffs who allegedly live in or regularly visit Washington D.C. Nor do they identify any evidence or witness located within the D.D.C.

With respect to the public interest factors, Plaintiffs assert Texas common law tort claims against GainJet for damages allegedly sustained by a San Antonio, Texas resident who alleges that he was surveilled in San Antonio, Texas and lured out of his San Antonio home. Plaintiffs have not asserted any connection to the District of Columbia. Accordingly, this District would have a stronger interest in this litigation than the D.D.C.

Accordingly, the Court concludes that Plaintiffs have failed to satisfy their burden of establishing that the D.D.C. is more convenient than this District, and their motion to transfer venue (ECF No. 84) is **DENIED**. *Volkswagen II*, 545 F.3d at 314.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion to transfer venue to the United States District Court for the District of Columbia (ECF No. 84) is **DENIED**.

It is so **ORDERED**.

**SIGNED** this 28th day of July, 2023.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE