UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| PAUL RUSESABAGINA *et al.* § | |
| *Plaintiffs* § | |
| § | |
| v. § | Case No.  SA-20-CA-01422-XR |
| § | |
| GAINJET AVIATION S.A., § | |
| *Defendant* § | |

## ORDER ON MOTION TO DISMISS

On this date, the Court considered Defendant's motion to dismiss this case for lack of subject matter and personal jurisdiction (ECF No. 24), Plaintiffs' response (ECF No. 28), Defendant's reply (ECF No. 29), Plaintiffs' sur-reply (ECF No. 32), and the parties' supplemental briefing following jurisdictional discovery (ECF Nos. 78, 80). After careful consideration, Defendant's motion is **GRANTED** for the reasons stated herein.

## BACKGROUND

This action arises out of the kidnapping of Paul Rusesabagina in August 2020 by the Rwandan government and its alleged co-conspirator, Defendant GainJet Aviation, S.A. ("GainJet"), a private jet charter operator and management company based in Athens, Greece.

Mr. Rusesabagina is a Rwandan humanitarian and activist, known for sheltering refugees during the Rwandan genocide and as a critic of Rwandan President Paul Kagame. After an assassination attempt in 1996, Mr. Rusesabagina fled from Rwanda to Belgium. Until his kidnapping, Mr. Rusesabagina divided his time between Belgium, where he has citizenship, and his home in San Antonio, Texas, where he is a lawful permanent resident of the United States.

I.       **Factual Allegations**

In 2020, a man who identified himself as Bishop Constantin Niyomwungere contacted Mr. Rusesabagina at his home in San Antonio, Texas, and invited him to speak at churches in Burundi about the Rwandan genocide and Hotel Rwanda. ECF No. 22 ¶ 124. The visit was intended to be short—from August 26, 2020 to September 2, 2020. *Id.* On August 26, 2020, Mr. Rusesabagina flew from San Antonio to Chicago and then to Dubai, United Arab Emirates, on Emirates Airlines. In Dubai, Mr. Rusesabagina boarded a private jet chartered by GainJet and was allegedly deceived into believing that he was flying to Burundi. Indeed, he alleges that, before takeoff, he chatted with the pilot, Alexandros Karpouzis, and a flight attendant, Louiza Boukla, who both confirmed that their destination was Burundi.[1] *Id.* ¶¶ 126, 131.

Unbeknownst to Mr. Rusesabagina, he was instead being flown—against his will—to Kigali, Rwanda. GainJet had in fact been paid and hired by Rwandan officials to fly Mr. Rusesabagina from Dubai to Kigali under an Annual Charter Contract with the Rwandan government. Upon landing in the early hours of August 28, 2020, Mr. Rusesabagina realized that he was at Kigali International Airport. He began to scream and tried to exit the plane, believing that he would be killed. Four Rwandan agents then entered the plane, tied his hands and legs, covered his face, and dragged him across the tarmac into a car—all in plain sight of the GainJet flight crew. Karpouzis, the pilot, allegedly wished Mr. Rusesabagina "good luck" as he was dragged off the plane. *Id.* ¶ 134.

On the tarmac, Mr. Rusesabagina was surrounded by armed Rwandan law enforcement officers and taken to an unknown location, where, bound and blindfolded, he was detained, interrogated, and physically and psychologically tortured for three days. *Id.* ¶¶ 139–40. After he

---

[1] These flight crew members are identified in the Amended Complaint as "Alexandre" and "Alice." *See* ECF No. 22 ¶ 131.

refused to confess to the terrorism-related crimes for which he was purportedly arrested, Mr. Rusesabagina was held in Nyarugenge Central Prison, where he remained for approximately two-and-a-half years before his eventual release and return to the United States in March 2023.

## II.    Procedural History

Mr. Rusesabagina and his wife and children filed this action in December 2020 against Niyomwungere and GainJet, alleging a conspiracy among the Rwandan government, Constantin Niyomwungere, and GainJet to extradite, detain, and torture Mr. Rusesabagina. ECF No. 1. After attempting for nearly a year to serve Niyomwungere with process, Plaintiffs voluntarily dismissed their claims against him and filed an Amended Complaint against GainJet only, asserting claims for civil conspiracy, fraud, false imprisonment, assault and battery, intentional infliction of severe emotional distress, and violations of international law. *See* ECF Nos. 21, 22.

In November 2021, GainJet moved to dismiss Plaintiffs' Amended Complaint, arguing that the Court could not exercise personal jurisdiction over GainJet and otherwise lacked subject matter jurisdiction over Plaintiffs' claims. ECF No. 24 at 24–27. In response, Plaintiffs moved for leave to conduct jurisdictional discovery to develop the facts needed to refute the jurisdictional allegations in GainJet's motion to dismiss. ECF No. 30.

At a hearing in February 2022, the Court granted Plaintiffs 90 days to conduct limited discovery, including the deposition of a corporate representative of GainJet, to determine whether they could establish specific jurisdiction over GainJet in Texas based on the flight in question, such as questions about whether GainJet was aware of the sham invitation, whether GainJet had anything to do with getting Mr. Rusesabagina from San Antonio to Dubai, and what information the Rwandan government gave to GainJet regarding the Dubai charter. ECF No. 52, Hr'g Tr. at 15:7–16:4.

In March 2022, Plaintiffs began serving jurisdictional discovery requests on GainJet, including a set of interrogatories, a set of requests for production of documents, and a notice to depose GainJet's designated FED. R. CIV. P. 30(b)(6) witness, Captain Ramsey Shaban Khdair. GainJet timely responded to the discovery requests and produced Khdair for a deposition in Athens on April 15, 2022. *See* ECF No. 62-1, Khdair Dep. at 4:2–6.

During discovery, Plaintiffs learned several pieces of information that, together with the allegations in the Amended Complaint, suggest that GainJet may have been both aware of and a willing participant in the conspiracy to kidnap Mr. Rusesabagina. First, the Rwandan government changed the departure date for the flight several times (through phone calls between the Rwandan official who booked the flight, John Paul, and his GainJet contact, Fedra Pergialioti) without explanation. Indeed, the GainJet aircraft used in the kidnapping sat on the tarmac in Dubai for nine days waiting for passengers, purportedly with no passenger information and no explanation from the Rwandan government as to why the aircraft should remain grounded. *See* ECF No. 62-1, Khdair Dep. at 101:24–102:3. Second, GainJet violated its own charter agreement by accepting passenger travel documents mere hours before departure and by failing to issue passenger tickets. The charter agreement requires passenger names to be forwarded to GainJet at least 48 hours in advance of departure to provide the information to immigration authorities in a timely manner and requires that passengers be issued tickets.[2] *Id.* at 37:9–38:25, 39:19–40:17. Third, GainJet changed its flight crew without reflecting the change in the flight manifest. *Id.* at 63:13–25. Finally, Khdair could not testify as to whether John Paul was in Texas when he communicated with Ms. Pergialioti

---

[2] GainJet denies that either of these actions constitutes a policy violation. Khdair testified that this was "not a binding figure" and noted that they quite often receive passenger information much closer to departure. ECF No. 62-1, Khdair Dep. at 38:20–25. He further explained that GainJet never issues tickets to passengers because the ticketing provision only applies to scheduled route carrier flights, which is not a service that GainJet currently provides. *Id.* at 40:3–41:18.

4

because the cell phone she used in their conversation was apparently "damaged" and replaced. *See id.* at 92: 3–7; 15–22.

Following this discovery, Plaintiffs moved for leave to re-open Khdair's deposition as to GainJet's role in the conspiracy to kidnap Rusesabagina before, during, and after the flight based on defense counsel's instructions to Khdair not to answer these questions. ECF No. 62. In November 2022, the Court denied the motion because Plaintiffs' proposed questions were directed to GainJet employees' awareness of the conspiracy to kidnap Mr. Rusesabagina rather than any purposeful contacts with the state of Texas. *Rusesabagina v. GainJet Aviation S.A.*, No. SA-20-CA-01422-XR, 2022 WL 17331272, at *6 (W.D. Tex. Nov. 29, 2022). Although the Court denied Plaintiffs' motion to conduct additional jurisdictional discovery, it granted the parties leave to file supplemental briefing on Defendant's motion to dismiss based on the discovery that had been accomplished. Still, the Court cautioned Plaintiffs that, "to the extent any such supplemental briefing is premised on the theory that GainJet is subject to personal jurisdiction as member of a conspiracy directed at a Texas resident, it is unlikely to cure the jurisdictional deficiencies in the Amended Complaint." *Id.* at *7. Both parties filed additional briefing. *See* ECF Nos. 78, 80.

In May 2023, while the motion to dismiss was still pending, Plaintiffs moved to transfer this case to the U.S. District Court for the District of Columbia ("D.D.C.") (ECF No. 84), based on a parallel action relating to the kidnapping that Plaintiffs had filed in 2022, through other counsel, against the Republic of Rwanda, President Kagame, and three Rwandan officials. *Rusesabagina v. Republic of Rwanda et al.*, No. 22-469 (RJL), ECF No. 1 (D.D.C. Feb. 22, 2022) (the "D.D.C. Action"). In that case, Plaintiffs asserted numerous claims for intentional torts under Texas common law and for violations of various federal laws, including the Electronic Communications Privacy Act, the Torture Victim Protection Act, and the Alien Tort Statute. *See*

*id.* In January 2023, Judge Richard Leon entered an order dismissing Plaintiffs' claims against Rwanda and Kagame as barred by the doctrines of sovereign immunity and head-of-state immunity, respectively. *Rusesabagina v. Republic of Rwanda*, No. 22-469 (RJL), 2023 WL 355951, at *6 (D.D.C. Jan. 23, 2023).

On March 16, 2023, Judge Leon issued an order granting in part and denying in part a motion to dismiss filed by the three remaining Defendants. *Rusesabagina v. Republic of Rwanda*, No. 22-469 (RJL), 2023 WL 2562692, at *12 (D.D.C. Mar. 16, 2023). Judge Leon found that Plaintiffs had failed to establish specific jurisdiction over the Rwandan officials in the D.D.C. because Plaintiffs had not pled specific acts within the District of Columbia. *Id.* at *6. Nonetheless, Judge Leon concluded that certain Rwandan officials were subject to the court's jurisdiction under Rule 4(k)(2), which, as discussed below, "is essentially a federal long-arm statute." *Id.* at *7 (citing *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 223 (D.C. Cir. 2022)). The Rwandan officials filed a notice of interlocutory appeal to the D.C. Circuit Court on March 30, 2023. D.D.C. Action, ECF No. 46. The next day, Plaintiffs stipulated to the dismissal of the lawsuit pending in the D.D.C. in exchange for Mr. Rusesabagina's safe return to San Antonio. ECF No. 48.

Although the D.D.C. Action had been dismissed, Plaintiffs asserted that transfer to the District of Columbia was warranted because the D.D.C. was already familiar with the relevant factual and legal issues and had asserted personal jurisdiction over some coconspirators allegedly involved in the kidnapping, who could serve as witnesses in this case. ECF No. 84. The Court denied the transfer motion, concluding that Plaintiffs had failed to establish that the District of Columbia would be a more convenient forum for litigating their claims than the Western District of Texas, especially in light of the dismissal of the D.D.C. Action. *See Rusesabagina v. GainJet Aviation S.A.*, No. SA-20-CA-01422-XR, 2023 WL 4853402, at *6–7 (W.D. Tex. July 28, 2023).

Accordingly, the Court returns to GainJet's motion to dismiss. ECF No. 24. Because the Court concludes that it lacks personal jurisdiction over GainJet under Rule 12(b)(2), it does not reach GainJet's challenges to the Court's subject matter jurisdiction under Rule 12(b)(1).

## DISCUSSION

### I.  Legal Standard

A federal district court has personal jurisdiction over a defendant if the long-arm statute of the state in which the court sits extends to the defendant and exercise of such jurisdiction is consistent with due process. *Sangha v. Navig8 ShipManagement Private Ltd.*, 882 F.3d 96, 101 (5th Cir. 2018). "Because the Texas long-arm statute extends to the limits of federal due process, the two-step inquiry collapses into one federal due process analysis." *Id.*[3] Due process requires that a defendant have "minimum contacts" with the forum state and that exercising jurisdiction is consistent with "traditional notions of fair play and substantial justice." *Sangha v. Navig8 ShipManagement Private Ltd.*, 882 F.3d 96, 101 (5th Cir. 2018).

"Minimum contacts" can give rise to either specific jurisdiction or general jurisdiction. *Wilson v. Belin*, 20 F.3d 644, 647 (5th Cir. 1994). Specific jurisdiction may exist "over a nonresident defendant whose contacts with the forum state are singular or sporadic only if the cause of action asserted arises out of or is related to those contacts." *Id.* In other words, such jurisdiction exists "when a nonresident defendant has purposefully directed its activities at the

---

[3] Texas's long-arm statute specifically provides that, "[i]n addition to other acts that may constitute doing business, a nonresident does business in this state if the nonresident:

   (1) contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state;
   (2) commits a tort in whole or in part in this state; or
   (3) recruits Texas residents, directly or through an intermediary located in this state, for employment inside or outside this state.

TEX. CIV. PRAC. & REM. CODE § 17.042.

7

forum state and the litigation results from alleged injuries that arise out of or relate to those activities." *Id*. "[S]pecific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Id.*

The Fifth Circuit has established a three-step analysis for determining whether specific jurisdiction exists: "(1) whether the defendant has minimum contacts with the forum state, i.e., whether it purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable." *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 271 (5th Cir. 2006) (quoting *Nuovo Pignone, SpA v. STORMAN ASIA M/V*, 310 F.3d 374, 378 (5th Cir. 2002)). Even where a defendant has no physical presence in the forum state, a single purposeful contact may be sufficient to confer personal jurisdiction if the cause of action arises from the contact. *Nuovo Pignone*, 310 F.3d at 379.

Specific jurisdiction "focuses on 'the relationship among the defendant, the forum, and the litigation.'" *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984)). In determining whether a defendant has minimum contacts with a state, courts consider whether the defendant's conduct and connection with the forum state is such that the defendant "should reasonably anticipate being haled into court there." *Burger King v. Rudzewicz*, 471 U.S. 462, 475 (1985)). For a court to exercise jurisdiction over a defendant, the relationship between the defendant and forum state "must arise out of contacts that the 'defendant himself' creates with the forum State," *Walden*, 571 U.S. at 284, not out of "the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the

8

State," *id.* at 286 (quoting *Burger King*, 471 U.S. at 475). In other words, the plaintiff cannot be the only link between the defendant and the forum. *Id.*

As the parties seeking to invoke the power of the court, Plaintiffs "bear[] the burden of establishing jurisdiction but [are] required to present only *prima facie* evidence." *Pervasive Software, Inc. v. Lexware GmbH & Co.*, 688 F.3d 214, 219 (5th Cir. 2012) (quoting *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 270 (5th Cir. 2006)). "In determining whether a *prima facie* case exists, this Court must accept as true [Plaintiffs'] uncontroverted allegations, and resolve in [their] favor all conflicts between the [jurisdictional] facts contained in the parties' affidavits and other documentation." *Pervasive Software*, 688 F.3d at 219–20.

## II. Analysis

At bottom, Plaintiffs' arguments in support of this Court's personal jurisdiction rely on GainJet's participation in the conspiracy to kidnap Mr. Rusesabagina. *See* ECF No. 78. The Fifth Circuit, however, does not recognize a "conspiracy theory" of personal jurisdiction. *Delta Brands, Inc. v. Danieli Corp.*, 99 F. App'x 1, 6 (5th Cir. 2004) (holding that the plaintiff must demonstrate that the defendant "individually, and not as part of the conspiracy, had minimum contacts with Texas"). Rather, to establish that the court has personal jurisdiction over a particular co-conspirator, the plaintiff must show that the conspiracy related to or arose out of that co-conspirator's purposeful contacts with the forum state. *See Rusesabagina*, 2022 WL 17331272, at *6 (collecting cases).

To the extent that a plaintiff invokes Federal Rule of Civil Procedure 4(k)(2), which permits a federal court to exercise jurisdiction over a defendant who is not subject to the jurisdiction of any single state, the plaintiff must establish minimum contacts *with the United States* related to the litigation. *See Douglass v. Nippon Yusen Kabushiki Kaisha*, 46 F.4th 226 (5th Cir. 2022). Rule

9

4(k)(2) was introduced to "close[ ] a loophole that existed prior to the 1993 amendments," by which "a non-resident defendant who did not have 'minimum contacts' with any individual state sufficient to support exercise of jurisdiction, but did have sufficient contacts with the United States as a whole, could escape jurisdiction in all fifty states." *Touchcom, Inc. v. Bereskin & Parr*, 574 F.3d 1403, 1414 (Fed. Cir. 2009). The rule provides:

> If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service is also effective, with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state.

FED. R. CIV. P. 4(k)(2). Thus, the rule permits a federal court to establish personal jurisdiction over a foreign defendant for (1) claims arising under federal law, (2) where a summons has been served, (3) if the defendant is not subject to the jurisdiction of any single state court, (4) provided that the exercise of federal jurisdiction is consistent with the Constitution (and laws) of the United States. *Mwani v. Bin Laden*, 417 F.3d 1, 10 (D.C. Cir. 2005).

The Fifth Circuit recently confirmed that Rule 4(k)(2) does not expand the constitutional basis for the exercise of personal jurisdiction; it is merely a procedural rule governing the territorial limits of service. It does not and cannot affect the due process analysis. *Id.* at 233:

> [A] foreign corporation's contacts satisfy Fifth Amendment due process only in cases where the parties' dispute arose out of or related to [its] *United States contacts*, that is, where specific jurisdiction exist[s]. The Fifth Circuit has never found that a foreign corporation's contacts with the United States alone supported general jurisdiction over unrelated lawsuits.

*Id.* at 238 (citations omitted) (emphasis added); *see also id.* at 235 ("If personal injury and wrongful death claims caused in foreign waters by a foreign logistics company's chartered, foreign-registered vessel bound for a foreign country are sufficiently related to that corporation's shipping-related contacts with the United States, then what isn't?").

While the Court agrees with Plaintiffs that much of the jurisdictional evidence suggests that GainJet was aware of or agreed to participate in the kidnapping, GainJet's intent to kidnap Mr. Rusesabagina does not establish *purposeful* contacts with Texas or with the United States as a whole simply because Mr. Rusesabagina is a resident of both Texas and the United States. *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 869 (5th Cir. 2001). Even assuming that, as Plaintiffs maintain, Mr. Rusesabagina was injured the moment he was lured from his home in San Antonio, there is no reason to believe that GainJet itself had any role in convincing Mr. Rusesabagina to leave the United States. Indeed, there is no evidence that GainJet ever contacted Mr. Rusesabagina about the flight while he was in Texas (or anywhere else in the United States) or had any other contact with Texas or the United States in furtherance of the conspiracy. *Cf. Rusesabagina*, 2023 WL 2562692, at *1 (reasoning that Rwandan officials were subject to jurisdiction in the D.D.C. based on their contact with and conduct directed toward the United States, including (1) illegal surveillance of Mr. Rusesabagina and his daughter in the United States using spyware planted on their phones, and (2) Niyomwungere's contacts with Mr. Rusesabagina in the United States on behalf of the Rwandan officials, intended to induce Mr. Rusesabagina to travel from the United States in August 2020).[4]

---

[4] At a hearing on July 11, 2023, Plaintiffs pointed out that the D.D.C.'s ruling on personal jurisdiction relied in part on allegations that various Rwandan officials participated in the broader conspiracy to surveil and kidnap Mr. Rusesabagina, even though their conduct did not involve any contacts with the United States. As the Court has discussed at length, however, the Fifth Circuit does not recognize a "conspiracy theory" of personal jurisdiction. It is not enough to allege that a defendant was part of a larger conspiracy directed at a particular resident of a state. It is equally insufficient, in the Fifth Circuit, to allege that a defendant was part of a larger conspiracy directed at a particular resident of the United States. *See Rusesabagina*, 2023 WL 2562692, at *2 ("General Joseph Nzabamwita, the head of Rwanda's National Intelligence and Security Services, allegedly admitted that he 'executed' the plot to kidnap Rusesabagina 'from the planning to the full execution, when he landed in Kigali.' Similarly, Johnston Businge, the former Minister of Justice, allegedly admitted his involvement in the plan to pay for the private aircraft used to kidnap Rusesabagina. And Colonel Jeannot Ruhunga both heads the RIB, which allegedly planned and executed the scheme, and was personally involved in its oversight.") (citations omitted).

It appears that GainJet employees may have deceived Mr. Rusesabagina by misrepresenting his destination while he was in Dubai. Unlike the Rwandan officials' international surveillance of Mr. Rusesabagina while he was in the United States, however, GainJet's misrepresentation to Mr. Rusesabagina in Dubai is not a contact with Texas or the United States, but with a person who happens to reside there. *Walden v. Fiore*, 571 U.S. 277, 284 (2014). This is insufficient to establish a purposeful contact with Texas or the United States.

Plaintiffs insist that this action is analogous to cases involving intentional pollution of rivers, arguing that "[t]he foreseeability that harm will occur in another jurisdiction . . . equates to express targeting of those other jurisdictions (not just targeting the plaintiff), thereby giving courts personal jurisdiction over the out-of-state tortfeasor." *See* ECF No. 78 at 11 (citing, e.g., *Pakootas v. Teck Cominco Metals, Ltd.*, 905 F.3d 565, 578 (9th Cir. 2018)). In *Pakootas*, the Ninth Circuit affirmed the district court exercise of personal jurisdiction over a Canadian company that dumped several million tons of industrial waste into the Columbia River at its British Columbian smelter, ten miles upstream of United States' border with Canada. Based on evidence that the company's leadership knew that the Columbia River carried waste away from the smelter and much of the waste travelled downstream into Washington, the panel concluded that the company "expressly aimed" the waste at the State of Washington. 905 F.3d at 578. "It is no defense that [the company]'s wastewater outfalls were aimed only at the Columbia River, which in turn was aimed at Washington," the panel reasoned, because "[r]ivers are nature's conveyor belts." *Id.*

Unlike the defendant in *Pakootas*, it is not even clear that GainJet employees had any reason to know or believe that the effects of its tortious conduct would be felt in Texas. That Mr. Rusesabagina's flight to Dubai originated in Texas does not establish that Mr. Rusesabagina lived in Texas at the time of the kidnapping, let alone that the flight crew knew that he lived in Texas.

12

Mr. Rusesabagina's arrival from Texas does not suggest that the effects of the kidnapping would be felt in the United States anymore than his departure from Dubai suggests that the effects of the kidnapping would be felt in United Arab Emirates. Indeed, Mr. Rusesabagina carried a Belgian passport, ECF No. 24-1, Khdair Decl. ¶ 32, and Plaintiffs acknowledge that he splits his time between Belgium and Texas, ECF No. 22 ¶ 20. Under Plaintiffs' theory of jurisdiction, it was equally foreseeable to GainJet that the effects of its tortious conduct would be "felt" in Belgium. *See also* ECF No. 24-1, Khdair Decl. ¶ 32 ("GainJet was not aware that either [Mr. Rusesabagina or Mr. Niyomwungere] had any connections to the United States or how they travelled to Dubai.").

Even if GainJet employees knew that Mr. Rusesabagina resided in Texas at the time of the kidnapping, Supreme Court and Fifth Circuit precedent require more to establish personal jurisdiction: the defendant must direct its actions toward the forum with the knowledge that the effects of its conduct would be felt there. *Fielding v. Hubert Burda Media, Inc.*, 415 F.3d 419, 425 (5th Cir. 2005) (citing *Calder*, 465 U.S. at 789–90). In *Fielding*, the Fifth Circuit affirmed the district court's conclusion that it could not exercise personal jurisdiction over two German magazines that had published articles about a Texas resident's affair with the Swiss ambassador to Germany. The magazines' activities were inadequately "directed" to Texas to satisfy minimum contacts because (1) the articles were aimed at a German audience—representing at least 94% of each magazine's circulation—and (2) the "brunt" of the plaintiff's reputational and emotional harm was suffered in Germany, not Texas. *Id.*

Here, Plaintiffs cannot establish jurisdiction over GainJet in Texas based on allegations of harm Mr. Rusesabagina suffered after he left Texas. Indeed, the *brunt* of Mr. Rusesabagina's injuries were suffered in Rwanda, not Texas.

The Court agrees with Plaintiffs that both the State of Texas and the United States have a strong interest in preventing residents and citizens from being kidnapped and wrongfully detained in other jurisdictions. But those sovereign interests mark the beginning—not the end—of the jurisdictional inquiry, which centers on due process. Until the Fifth Circuit recognizes conspiracy jurisdiction, the Court cannot, on these facts, conclude that GainJet is subject to personal jurisdiction in Texas.

Accordingly, Plaintiffs have failed to establish a basis for the Court's personal jurisdiction over GainJet, *Pervasive Software*, 688 F.3d at 219–20, and their claims against GainJet must be dismissed.

## CONCLUSION

For the forgoing reasons, Defendant GainJet Aviation, S.A.'s motion to dismiss (ECF No. 24) Plaintiffs' Second Complaint for lack of personal jurisdiction is **GRANTED**.

A final judgment pursuant to Rule 58 will follow.

It is so **ORDERED**.

**SIGNED** this 27th day of June, 2024.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE